132 F.3d 869
 77 Fair Empl.Prac.Cas. (BNA) 503,
72 Empl. Prac. Dec. P 45,145
Joyce STRATTON, Plaintiff-Appellee,
v.
The DEPARTMENT FOR THE AGING FOR THE CITY OF NEW YORK, The
City of New York, and Prema Mathai-Davis,
Defendants-Appellants.
 No. 1616, Docket 96-9064.
 United States Court of Appeals,
Second Circuit.
 Argued March 13, 1997.
Decided Oct. 16, 1997.
 
 1
 Jeffrey C. Slade, New York City (Andrew D. Herz, Leventhal & Slade, Mark J. Stratton, on the brief), for Plaintiff-Appellee.
 
 
 2
 Jane L. Gordon, Assistant Corporation Counsel, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Barry P. Schwartz, Assistant Corporation Counsel, on the brief), for Defendants-Appellants.
 
 
 3
 Before: WALKER, McLAUGHLIN, Circuit Judges, and CHIN, District Judge.*
 
 
 4
 CHIN, District Judge.
 
 
 5
 In this case, a 61-year old employee of the Department for the Aging for the City of New York ("DFTA") was discharged after some 21 years of service. She brought this action against DFTA and its Commissioner, alleging age discrimination and retaliation. After a five-day trial, a jury concluded that defendants had unlawfully and wilfully discriminated and retaliated against her. Judgment was entered in her favor in the amount of $1,559,359.01. Defendants appealed. For the reasons set forth below, we affirm.
 
 STATEMENT OF THE CASE
 A. The Facts
 1. The Parties
 
 6
 Defendant-appellant DFTA was created in 1968 and was initially known as the "Mayor's Office for the Aging." It is the city agency responsible for promoting and coordinating services for the elderly. It provides a broad range of services, primarily through contracts with non-profit organizations. It also engages in advocacy and policy analysis.
 
 
 7
 Defendant-appellant Prema Mathai-Davis ("Mathai-Davis") was appointed Commissioner of DFTA in January 1990, when she was 39 years old. She replaced Janet Sainer, the former Commissioner, who was then 71 years old.
 
 
 8
 Plaintiff-appellee Joyce Stratton ("Stratton") was employed at DFTA from January 5, 1970 through February 21, 1991, when she was discharged. At the time, she was 61 years old.
 
 2. Stratton's Employment with DFTA
 
 9
 For most of her 21 years at DFTA,[1] Stratton was the director of the Central Information and Referral Bureau ("Central I & R"), which was responsible for providing a wide array of information about and services for the elderly. For example, Central I & R distributed different technical directories and pamphlets to 2,600 agencies, which explained government programs and benefits available to the elderly. One witness at trial described Central I & R as "the front line to the very poorest and most frail in the city."
 
 
 10
 Throughout her employment with DFTA, Stratton received very favorable performance evaluations. From 1981 until the appointment of Mathai-Davis as Commissioner, Stratton consistently received performance ratings of "outstanding" or "very good," the two highest possible ratings. Her supervisor for the period from 1982 through late 1989, Marcia Stein, testified that a "very good" rating was "above the median." She also testified that Stratton had an "expertise" in the area of benefits and entitlements that "very few of us had" as well as a "passion for the poor elderly that ... fueled her in advocating for them." In August 1990, Stratton received an award from the Regional Commissioner of the Social Security Administration for her work on a Supplemental Security Income outreach program.
 
 
 11
 When Mathai-Davis took over as commissioner, Stein, who was then 51 years old, was replaced by 39-year old Lorraine Cortez-Vasquez. A number of other changes in DFTA followed as it was reorganized. Certain of these changes were reflected in DFTA's organizational charts. The average age of the individuals listed on the organizational chart as of January 31, 1990, when Mathai-Davis took over as Commissioner for Sainer, was 50.3, while the average age for the individuals on the April 30, 1991 chart was 45.9.
 
 
 12
 As part of the changes, DFTA also shifted certain of Central I & R's functions to the field offices. After considering different options, DFTA decided to retain Stratton as Director of the reorganized Central I & R. Implementation of the "decentralization" of Central I & R was commenced, but before the process was completed, the City's "fiscal crisis" and resultant "budget cuts intervened."
 
 
 13
 After Mathai-Davis took over as Commissioner, the manner in which Stratton was treated by her supervisors changed. She was told not to send out certain publications that she had distributed for many years. She was told not to participate on task forces and committees that she had previously served on. She was not consulted about the organizational changes that were being made in DFTA, including changes to her bureau. She was not invited to the new Commissioner's retreat for senior staff in the spring of 1990, held "to restate the mission and set objectives for the coming years," even though she had been invited to the prior retreat when Sainer was appointed Commissioner, and even though she was considered senior staff and was the head of a unit. Cortez-Vasquez held closed door meetings with Stratton's staff without her knowledge. Stratton's secretary, administrative assistant, and technical writer were taken away. Parts of her bureau were taken away. Caseworkers whom she had been supervising were reassigned to offices in other boroughs as well as to a newly-created "Manhattan field office," located within Central I & R's offices. And in her first performance evaluation after Mathai-Davis and Cortez-Vasquez took over, Stratton's overall rating was lowered to "good"--the first time that she had ever received an overall rating of less than "very good."
 
 3. Stratton's Dismissal
 
 14
 Because of the "budget crisis," DFTA laid off 36 employees in February of 1991. Stratton was one of them. Management did not, however, consult Stratton about any of the changes, even though she was the Director of Central I & R and had been at DFTA some 21 years. DFTA decided to eliminate Stratton's position purportedly because it would be difficult, with the planned reductions in staff, to justify having a manager at her level. As Ted Taberski, DFTA's Director of Administration and Budget, testified at trial, "the [D]epartment didn't see a role that [Stratton] would be suited for of those that were available."
 
 
 15
 When Stratton learned that she was going to be discharged, she sought the assistance of Mary Mayer, DFTA's director of research. She asked Mayer to speak to the Commissioner on her behalf and asked Mayer to specifically mention her age because she was concerned about the impact dismissal would have on her pension. In a later conversation, Mayer told Stratton that she had spoken to the Commissioner and had specifically mentioned Stratton's age. According to Mayer, the Commissioner responded: " 'What about young mothers who are being fired?' "
 
 
 16
 Before her employment was actually terminated, Stratton retained counsel who met with DFTA in an effort to prevent her dismissal. Stratton's counsel raised the issue of age discrimination as well as Stratton's concerns about the impact termination would have on her pension. Stratton's counsel discussed with representatives of DFTA the possibility of finding Stratton another job.[2] Stratton herself spoke directly to a number of people, and "begged [them] to intervene" in an effort to keep her job or to find another one.
 
 
 17
 Although DFTA contended that there was no longer a need for Stratton as a manager because of the purported staff reductions, in fact there continued to be a need for supervision in Central I & R. As city-funded workers in Central I & R were laid off, they were replaced by federally-funded "Title V" workers who needed supervision. Just a few days after Stratton was laid off, her duties were taken over on a part-time basis by Kitty Williston, who was almost 13 years her junior. Williston was given the title of Acting Director of Central I & R; she sat at Stratton's old desk; and she supervised 17 people (including 11 federally-funded Title V workers). Central I & R continued to be "busy" and its staffing subsequently was increased by an additional three persons.
 
 
 18
 At some point in 1991, DFTA started looking for a full-time supervisor of Central I & R. In early 1992, DFTA filled the position with Jean McEwan, who was some 26 years younger than Stratton. McEwan had been employed by DFTA as a Community Coordinator for some three years when she was laid off in 1991, and had had no prior experience in Central I & R. Stratton was never contacted or interviewed for the job.
 
 
 19
 Eventually, DFTA "recalled quite a number of [employees]" who had been laid off; all of the community associates and community coordinators who had been laid off were recalled. These were "noncompetitive" employees who were given the opportunity to be rehired and two were actually rehired. Stratton participated in a program for laid-off employees at the City's Redeployment Center. According to testimony from Sarah Rosenfeld, DFTA's Director of Personnel and Labor Relations, the Redeployment Center would send out referrals for former staff they felt might be qualified for vacant positions. Rosenfeld acknowledged that referrals "were supposed to receive consideration before anybody else" and that Stratton had been referred for some vacancies. Stratton was not, however, "called back" for an interview for any position within DFTA. She received only one call from the Redeployment Center for an interview, which was for a position with another agency working with 14-21 year-olds who had committed violent crimes. She interviewed for the position but did not get the job. She was never offered an alternative position within DFTA.
 
 
 20
 In May 1991, Stratton filed a charge of discrimination with the United States Equal Employment Opportunity Commission. She commenced this lawsuit on October 2, 1991.
 
 
 21
 4. Stratton's Application for the New DFTA Position
 
 
 22
 In April 1992, Stratton saw an advertisement in The New York Times for an opening at DFTA for the newly-created position of Director of the Bureau of Program and Resource Development. Although the Redeployment Center had referred Stratton for that particular position, DFTA had not contacted Stratton in response to the referral. Stratton submitted an application directly and, as a result of that application, she was interviewed by Mary Mayer and Sarah Rosenfeld. Although the position had been split into two positions by the time Stratton was interviewed, Stratton was well qualified for at least one of the new positions, Director of the Bureau of Benefits and Entitlements. In fact, in her view there was no one "better qualified" for the position, because the job encompassed "all of what I & R had done and then more."
 
 
 23
 Rosenfeld, the Director of Personnel, usually did not interview applicants for jobs, but she was asked by Rabin, DFTA's General Counsel, to interview Stratton. She did not interview any of the other candidates, and she acknowledged at trial that she was not in a position to evaluate Joyce Stratton as to her skills and abilities in providing services and that she would not be able to make any comparisons between Stratton and other candidates. Although Rabin interviewed a dozen candidates and participated in the process of screening the applicants and making recommendations to the Commissioner, he chose not to interview Stratton.[3] In the end, Mayer and Rabin narrowed the list down to three individuals. Stratton was not among them. The person who was hired, Joseph Barnes, was 17 years younger than Stratton. His starting salary was $70,000. One of the other candidates, Donna Tessitore, was 21 years younger; she was eventually hired for another position in DFTA. The age of the third candidate is not known from the record.
 
 B. The Proceedings Below
 
 24
 This action was commenced on October 2, 1991. The complaint asserted claims of discrimination, based on DFTA's termination of Stratton's employment, under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. (the "ADEA"), and the New York State Human Rights Law, Executive Law § 296 et seq. (McKinney 1993 & Supp.1997). In December 1993, the complaint was amended to add discrimination and retaliation claims under the ADEA and the Human Rights Law based on DFTA's failure to rehire Stratton.
 
 
 25
 The case was tried to a jury starting on November 27, 1995, with Judge Shira A. Scheindlin presiding. On December 1, 1995, the jury returned a verdict in favor of Stratton. The jury found that Stratton had proven that the reasons articulated by defendants for terminating her employment or for not "recalling or rehiring her" were not the true reasons. It found that Stratton had proven that age was a determinative factor in defendants' decision to terminate her employment or not to recall or rehire her. It found that Stratton had proven that defendants' actions were motivated at least in part by a desire to retaliate against her for filing an age discrimination claim against them. The jury awarded $500,000 in back pay and found that defendants' actions were wilful.
 
 
 26
 Post-trial motions followed. Defendants moved pursuant to Fed.R.Civ.P. 59(a) for a new trial or remittitur and pursuant to Fed.R.Civ.P. 50(b) for judgment as a matter of law dismissing the complaint. Stratton cross-moved for an award of front pay and the restoration of her full pension and social security benefits. In an Opinion and Order dated March 12, 1996, Judge Scheindlin denied defendants' motions, conditioning the denial of the motion for a new trial on the amount of damages on Stratton's acceptance of a reduction in the back pay award from $500,000 to $373,886.23, which would be doubled pursuant to the liquidated damages provision of the ADEA, 29 U.S.C. § 626(b), because of the jury's finding of wilfulness. Judge Scheindlin also granted Stratton's cross-motion and awarded $378,000 in front pay and other benefits. Stratton v. Department for the Aging, 922 F.Supp. 857 (S.D.N.Y.1996).
 
 
 27
 Stratton then moved for attorneys' fees and costs and prejudgment interest. In an Opinion and Order filed June 25, 1996, Judge Scheindlin granted the motion and awarded attorneys' fees and costs in the amount of $337,760.03 and prejudgment interest in the amount of $63,880.75. Stratton v. Department for the Aging, No. 91 Civ. 6623, 1996 WL 352909 (S.D.N.Y. June 25, 1996).
 
 
 28
 Stratton accepted the remittitur, and final judgment was entered on July 23, 1996, in the total amount of $1,559,359.01, consisting of $747,772.46 (the back pay award of $373,886.23 doubled by virtue of the jury's finding of wilfulness), $378,000 in front pay and other benefits, $337,760.03 in attorneys' fees and costs, $63,880.75 in prejudgment interest awarded by Judge Scheindlin on June 24, 1996, and additional prejudgment interest.
 
 
 29
 This appeal followed.
 
 DISCUSSION
 
 30
 On appeal, defendants make three principal arguments: first, they contend that the district court erred in receiving into evidence, over defendants' objection, the two organizational charts showing the ages of DFTA's senior staff before and after Mathai-Davis took over as Commissioner; second, they argue that the evidence was insufficient to support the jury's findings of wilful discrimination and retaliation; and third, they contend that the compensatory damages award, even as reduced by the district court, was excessive.
 
 A. The Charts
 
 31
 We review the district court's decision to admit the two charts into evidence for abuse of discretion. See Eagleston v. Guido, 41 F.3d 865, 873 (2d Cir.1994); United States v. Jamil, 707 F.2d 638, 642 (2d Cir.1983).
 
 
 32
 The two charts consisted of DFTA's own organizational charts, one as of January 31, 1990 (just before Mathai-Davis took over), and one as of April 30, 1991 (some 14 months later). The charts were "marked up" to show each person's age and to show that the average age had dropped from 50.3 when Sainer was Commissioner to 45.9 after Mathai-Davis took over. Defendants argue that the district court abused its discretion in admitting the exhibits on the grounds that this statistical evidence was "inherently unreliable and misleading." (Def. Br. at 26-27, citing Fisher v. Vassar College, 70 F.3d 1420 (2d Cir.1995), on reh'g en banc, 114 F.3d 1332 (2d Cir.1997) (concurring in panel decision), cert. denied, --- U.S. ----, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)). In particular, defendants complain that the charts were received without the benefit of expert testimony, that there was an insufficient explanation of how the numbers were derived from the underlying evidence, and that Stratton engaged in selective sampling in using these particular charts. These arguments, however, are unavailing.
 
 
 33
 First, the two charts were reliable. They were defendants' own documents--organizational charts prepared by DFTA in the ordinary course of business, as of two different dates, one just before Mathai-Davis took over and one 14 months later. The only information added were the ages of the individuals listed and the averages of all their ages, and this basic information, taken from defendants' own records, was not disputed. There was no selective sampling as everyone on each chart was included in calculating the average age.
 
 
 34
 Second, no expert was required. See Green v. Kinney Shoe Corp., 715 F.Supp. 1122, 1124 (D.D.C.1989) ("[p]arties should not be deprived of the opportunity to present the results of fairly simple statistical tests simply because they cannot obtain the services of a trained statistician"). There was no "gerrymandering" of statistics here. Rather, simple arithmetic was used--the ages of all the individuals were used to calculate an average age for each chart. There were no sophisticated statistical theories that needed explanation. See Bruno v. W.B. Saunders Co., 882 F.2d 760, 766-67 (3d Cir.1989) (in individual disparate treatment case, statistical evidence may be less finely tuned than in a disparate impact case); see also Deloach v. Delchamps, Inc., 897 F.2d 815, 820 (5th Cir.1990).
 
 
 35
 Third, defendants could have offered their own charts or statistics or called their own expert witness. If there were other organizational charts that showed a different average age, defendants could have offered them. If defendants felt an expert witness would have helped clarify the charts, they could have called such a person to testify. They did none of these things.
 
 
 36
 Fourth, the drop in the average age of all the individuals sufficiently senior to be listed on the organizational charts was relevant. See Schulz v. Hickok Mfg., Co., 358 F.Supp. 1208, 1213 (N.D.Ga.1973) (permitting into evidence statistics showing average age of managers had dropped by nearly 13 years in 18-month span). Although statistics play a much more substantial role in disparate impact cases, they are admissible to support a claim of discrimination even in a disparate treatment case involving a single plaintiff. Hudson v. International Bus. Mach. Corp., 620 F.2d 351, 355 (2d Cir.1980); see Sweeney v. Board of Trustees of Keene State College, 604 F.2d 106, 113 & n. 11 (1st Cir.1979) (statistics add color and may be helpful to an individual claim of discrimination).
 
 
 37
 Finally, Stratton was not relying solely on the two charts. To the contrary, the two charts were only part of the overall proof. As the district court concluded, the charts were accompanied by substantial other evidence showing discrimination. Moreover, the district court cautioned the jury not to place undue reliance on the charts by giving the following instruction:
 
 
 38
 The plaintiff has presented two exhibits in the form of charts. You should consider these charts and summaries as you would any other evidence. I do, however, want to remind you that the statistics plaintiff showed you are not conclusive proof in any way of an employer's reasons for a particular discharge. They may be relevant simply on the question of motive. Naturally, it is for you to decide what relevance, if any, they have regarding defendants' motive.
 
 
 39
 In view of the simple nature of the statistical analysis, the district court's cautioning instruction, and the overall evidence in the case, the district court did not abuse its discretion by receiving the charts into evidence.B. The Sufficiency of the Evidence
 
 
 40
 Defendants attack the sufficiency of the evidence with respect to the jury's findings that defendants wilfully discriminated and retaliated against Stratton by firing her and failing to rehire her. The district court denied defendants' motion pursuant to Fed.R.Civ.P. 50(b) to this effect.
 
 
 41
 In ruling on a motion for judgment as a matter of law under Rule 50(b), a district court is required to
 
 
 42
 consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.
 
 
 43
 Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir.1988) (internal quotes omitted); see LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir.1995), cert. denied, 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996). The court may properly grant the motion only if there is " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party].' " LeBlanc-Sternberg, 67 F.3d at 429 (citing Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir.1992)). The same standard governs appellate review of a decision granting or denying judgment as a matter of law. See, e.g., LeBlanc-Sternberg, 67 F.3d at 429-30 (reversing grant); Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 889 (2d Cir.1988) (upholding denial).
 
 
 44
 The "ultimate issue" in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., a discriminatory reason. Fields v. New York State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119 (2d Cir.1997); see St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Renz v. Grey Adver., Inc., 135 F.3d 217, 220-22 (2d Cir. 1997) (age need not be principal or sole factor); Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir.1997) ("the ultimate burden of persuading the trier of fact of intentional discrimination remains at all times with the plaintiff"). A plaintiff may meet that burden by using a "mixed-motives" analysis, de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs., 82 F.3d 16, 23 (2d Cir.1996), petition for cert. filed, (U.S. July 10, 1996) (No. 96-5214); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1181 (2d Cir.1992),[4] or by proving "pretext" under the three-step analysis first enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). See also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981); de la Cruz, 82 F.3d at 20. In the present case, Stratton relied solely on a "pretext" theory and the McDonnell Douglas analysis.
 
 
 45
 In recent years, the three-step McDonnell Douglas formulation has been clarified. St. Mary's Honor Center, 509 U.S. at 510-11, 113 S.Ct. at 2748-50; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir.1997) (en banc ), cert. denied, --- U.S. ----, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). First, the plaintiff must establish a prima facie case of unlawful discrimination by showing that 1) she is a member of a protected class 2) who performed her job satisfactorily (or who was qualified for a new position) 3) who was discharged (or not offered the new position) 4) under circumstances giving rise to an inference of discrimination (or retaliation). McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir.1997); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir.1994).
 
 
 46
 Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." Fisher, 114 F.3d at 1335-36.
 
 
 47
 Third, if the defendant articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." St. Mary's Honor Center, 509 U.S. at 510-11, 113 S.Ct. at 2748-50. The plaintiff must then show, on the basis of all the evidence presented and without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by discrimination. Because the defendant has at this point offered a non-discriminatory reason for its actions, the plaintiff must show that the proffered reason is in reality a pretext for unlawful discrimination, i.e., that it is "a mask for unlawful discrimination." Fisher, 114 F.3d at 1337.[5] While a finding of pretext will not always lead to a conclusion of discrimination, it may, in some cases, constitute "powerful evidence of discrimination." Id. at 1338.
 
 
 48
 In the present case, defendants concede that Stratton demonstrated the first three elements of a prima facie case of discrimination and retaliation. They contend, however, that Stratton failed to show that she was discharged under circumstances that give rise to an inference of age discrimination or retaliation. They further contend that even if Stratton proved the fourth element of her prima facie case, she did not prove that their articulated reasons for dismissing her--the "budget crisis"--and for not rehiring her--she was not the most qualified candidate for the position--were pretextual.
 
 
 49
 Defendants' arguments are rejected. Viewing the evidence in the light most favorable to Stratton, and giving her the benefit of all reasonable inferences, we cannot say that the jury's findings were the result of "sheer surmise and conjecture" or that fair minded persons could not have arrived at this verdict. Logan v. Bennington College Corp.,, 72 F.3d 1017, 1022 (2d Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996).
 
 
 50
 The record contains sufficient evidence to support the jury's conclusions that defendants discriminated against Stratton because of her age. That evidence included the following: Stratton, a 61-year old employee with a strong record, was inexplicably treated in a negative fashion as soon as a new (and substantially younger) Commissioner and supervisor took over;[6] although Stratton was a senior manager with 21 years of experience, she was inexplicably excluded from meetings as well as a retreat organized by the new Commissioner for senior staff and she was not consulted about organizational changes being made to DFTA and her own bureau; her duties were taken over first on a part-time basis by someone 13 years younger and then later on a full-time basis by someone 26 years younger; the average age of senior staff dropped nearly five years within 14 months after the new Commissioner took over; when Stratton's concerns about her age and pension were mentioned to the new Commissioner, she responded: " 'What about the young mothers who are being fired?' ", a statement that the jury could reasonably have viewed as evidencing a preference for young mothers over older workers based on a perception that the former had more to lose from layoffs than the latter; when efforts were made by Stratton's lawyers to obtain another position for her within DFTA, and even though other laid-off employees were finding positions, Rabin said: "Her position is eliminated[;][w]e have nothing else for her here"; and DFTA failed to consider her for her old position or to meaningfully consider her for a new position for which she was well qualified, despite receiving redeployment-center referrals for Stratton to which DFTA admittedly had a responsibility to give priority consideration.
 
 
 51
 The evidence at trial also was sufficient to support the jury's finding of pretext. It is undisputed that in 1990 and 1991, New York City was experiencing a budget crisis. But the jury's implicit finding that defendants could have retained Stratton in some capacity at DFTA notwithstanding the budget crisis is supported by the record. For example, although defendants contended that there was no longer a need for Stratton as a manager because of staff reductions caused by the budget cuts, in fact there was a continued need for a manager because Central I & R continued to be busy, federally-funded Title V workers replaced laid-off city employees, and certain city employees were recalled and rehired. The jury could have reasonably found that, even assuming the duties of the Director position were changed to some extent, Stratton could have been retained to fill the position that Williston first filled on a part-time basis and that McEwan later filled on a full-time basis.[7] There simply was no plausible reason why DFTA would cast aside and mistreat a 21-year veteran in the manner that the jury found that it did or why DFTA would refuse to meaningfully consider her for new positions for which she was qualified and available. Moreover, evidence in the record also indicated that within two years of Mathai-Davis's appointment as Commissioner the number of employees who earned as much as or more than Stratton had increased from 16 to 28. Furthermore, of the 12 such employees who had start dates between October 1990, and March 1993, all were younger than Stratton, eight by at least 15 years.
 
 
 52
 A finding of pretext, of course, does "not necessarily mean that the true motive was the illegal one argued by the plaintiff." Fisher, 114 F.3d at 1338. Rather, the pretext may mask some other improper, albeit not illegal, motivation, such as "back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, [or] spite." Id. at 1337. Here, however, defendants never argued at trial that their actions were actually motivated by some other, non-discriminatory motive, for they never acknowledged the possibility that their articulated reasons for their employment decisions could be found to be pretextual. See Binder v. Long Island Lighting Co., 57 F.3d 193, 200 (2d Cir.1995) ("We do not exclude the possibility that an employer may explain away the proffer of a pretextual reason for an unfavorable employment decision.... [But n]o such explanation was offered.") (citations omitted). Hence, there was no basis for the jury to conclude that there was any motivation for the pretext other than discrimination, and the jury's conclusion that, more likely than not, defendants articulated a false explanation to conceal a discriminatory, as opposed to non-discriminatory, motive was more than reasonable. The jury's finding of pretext and the evidence establishing Stratton's prima facie case, taken together, are more than sufficient to sustain the jury's ultimate finding of discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) (factfinder's disbelief of defendant's proffered reasons together with prima facie case will permit factfinder to infer intentional discrimination); Fisher, 114 F.3d at 1338 ("The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case [and] on the other findings and evidence that accompany it.").
 
 
 53
 Likewise, the jury's finding that defendants retaliated against Stratton is supported by the evidence, including the evidence of discrimination discussed above. Stratton was undeniably treated differently from all the other candidates for the position of Director of the Bureau of Benefits and Entitlements. The jury was entitled to reject defendants' explanation for its disparate treatment of Stratton and it was entitled, from the record evidence, to find that Stratton was more qualified than the successful candidate and that she was not fully considered or hired because she had filed a claim of discrimination.
 
 
 54
 Finally, the jury's finding of wilfulness was supported by the evidence. An employer acts wilfully if it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Hazen Paper Co. v. Biggins, 507 U.S. 604, 617, 113 S.Ct. 1701, 1709-10, 123 L.Ed.2d 338 (1993). Here, the jury's finding that defendants knew that their conduct was prohibited by statute is amply supported by the evidence. Defendants were charged with the responsibility of protecting the rights of older Americans. Moreover, the issue of age discrimination was raised by Stratton's attorneys before she was dismissed, and hence there can be no question that defendants were aware, before they made any final decisions with respect to Stratton's employment, that age discrimination was unlawful. Yet, as the jury found, they acted in a discriminatory and retaliatory manner nonetheless.
 
 
 55
 Accordingly, we affirm the jury's findings that defendants wilfully discriminated and retaliated against Stratton.
 
 C. Damages
 
 56
 Three issues remain with respect to damages: (1) the use of a $70,000 annual salary figure to compute damages; (2) the award of an additional 35% for "fringe benefits"; and (3) the failure of the district court to discount the front pay award to present value.
 
 
 57
 In reviewing a claim of excessive damages, an appellate court must accord substantial deference to the jury's determination of factual issues. See Wheatley v. Ford, 679 F.2d 1037, 1039 (2d Cir.1982). The trial court's determination not to set aside or reduce a jury award will be overturned only for abuse of discretion. See, e.g., Martell v. Boardwalk Enters., Inc., 748 F.2d 740, 750 (2d Cir.1984); Batchkowsky v. Penn Central Co., 525 F.2d 1121, 1124 (2d Cir.1975). Here, of course, Judge Scheindlin ordered a remittitur. Hence, the question is whether she abused her discretion in declining to further reduce damages.
 
 
 58
 Defendants' contention that the use of a $70,000 salary, which was the salary earned by Joseph Barnes, the successful candidate for the position of Director of the Bureau of Benefits and Entitlements, is speculative is based solely on their argument that Barnes was a "far superior candidate" to Stratton and that she therefore never would have gotten the position. The short answer to this argument, however, is that the jury rejected it. The jury concluded that Barnes was not more qualified and that, but for the discriminatory and retaliatory acts of defendants, Stratton would have gotten that position. Hence, as Judge Scheindlin held, it was rational for the jury to base damages on a $70,000 annual salary.
 
 
 59
 Likewise, the use of a 35% figure for fringe benefits is supported by the record. Although 35% may appear to be high, Stratton testified that the "rule of thumb" for the value of fringe benefits was 35% of salary. The jury was entitled to accept this testimony. Defendants offered no evidence of their own to show that the 35% rule of thumb was wrong or high. See Rios v. Enterprise Ass'n Steamfitters Local 638 of U.A., 651 F.Supp. 109, 114-15 (S.D.N.Y.1986) (awarding fringe benefits equal to 30% of salary), rev'd on other grounds, 860 F.2d 1168 (2d Cir.1988). Moreover, although defendants did object to this testimony, Judge Scheindlin construed the objection only as a foundation objection. She did not abuse her discretion in permitting Stratton, who had been personally involved in hiring employees and managing their salaries for many years, to testify in this respect. To the extent defendants now seek to raise additional objections for the first time on appeal, those objections must be deemed waived. See BBS Norwalk One, Inc. v. Raccolta, Inc., 117 F.3d 674, 678 (2d Cir.1997) (citing Greene v. United States, 13 F.3d 577, 586 (2d Cir.1994)).
 
 
 60
 Finally, defendants' contention that the district court erred by not discounting its front pay award to present value is also rejected. The district court did not factor future salary increases into its front pay award; hence, it was not required to discount to present value. See, e.g., Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1257-58 (2d Cir.1987) (affirming front pay award not discounted to present value); Gusman v. Unisys Corp., 986 F.2d 1146, 1147-48 (7th Cir.1993) (same); cf. Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1189 (2d Cir.1992) (upholding front pay award discounted to present value after 17 years of projected annual 8.3% salary increases were factored in); Whittlesey v. Union Carbide Corp., 1983 WL 652, at * 2 (S.D.N.Y.1983) (discounting to present value only after factoring in projected inflation values), aff'd, 742 F.2d 724 (2d Cir.1984).
 
 
 61
 The damages calculations are affirmed as well.
 
 CONCLUSION
 
 62
 For the reasons set forth above, the judgment of the district court is affirmed in all respects.
 
 
 
 *
 The Honorable Denny Chin of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Although Stratton worked at DFTA for 21 years, for a three-year period in the early 1970's she was not technically a city employee, as her salary was paid from a different funding source. Consequently, for pension purposes, she had only 18 years of service
 
 
 [2]
 Michael Rabin, Deputy Commissioner and General Counsel for DFTA, testified that Mark Stratton, an attorney and Stratton's son, had told him in a telephone conversation that Stratton would not be interested in a position that paid only in the "mid to upper thirties." Mark Stratton denied ever making such a statement. Indeed, Mark Stratton testified as follows:
 Q. What did Mr. Rabin say to you when you said, "Is there another job for my mother?"
 A. He said, "Her position is eliminated. We have nothing else for her here."
 In view of the jury's verdict, of course, we must resolve this conflict in the evidence in favor of Stratton.
 Rabin was hired in 1990 or 1991 to replace Emilio Gautier as General Counsel. Although there was a "budget crisis" that purportedly necessitated lay-offs, Rabin was hired at a salary of $76,000 to replace Gautier, who was earning a salary of only $52,410 when he left. At the time, Rabin was 39 years old and Gautier was 58 years old.
 
 
 [3]
 Although Rabin testified that he decided to recuse himself from interviewing Stratton because of his involvement in the litigation that Stratton had commenced, the jury was entitled to reject this testimony
 
 
 [4]
 A plaintiff may establish a "mixed-motives" case by "convinc[ing] the trier of fact that an impermissible criterion in fact entered into the employment decision." Tyler, 958 F.2d at 1181. In a mixed-motives case, the plaintiff must "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." Tyler, 958 F.2d at 1181 (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 S.Ct. 1775, 1794-95, 104 L.Ed.2d 268 (1989)); see de la Cruz, 82 F.3d at 23. If a plaintiff demonstrates that a discriminatory motive is present, even if a legitimate motive also exists, the burden of proof, and not merely the burden of production, passes to the defendant. Price Waterhouse, 490 U.S. at 250, 109 S.Ct. at 1790-91. The defendant can then escape liability only by showing by a preponderance of the evidence that, even without the presence of the illegitimate factor, the decision would have been the same. Price Waterhouse, 490 U.S. at 250, 109 S.Ct. at 1790-91; de la Cruz, 82 F.3d at 23; Tyler, 958 F.2d at 1181
 
 
 [5]
 Alternatively, of course, a plaintiff may seek to prove discrimination without proving pretext by proceeding on a "mixed-motives" theory. See footnote 4 supra
 
 
 [6]
 Actions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate. See Bullard v. Sercon Corp., 846 F.2d 463, 466 (7th Cir.1988) (fact that an employee is fired "without good cause" may in some cases be evidence of discrimination); In re Lewis, 845 F.2d 624, 633 (6th Cir.1988) (Employer's decision to fire plaintiff "may have been so unusual or idiosyncratic as to shed light upon [its] motivation in firing her. The more questionable the employer's reason, the easier it will be for the jury to expose it as pretext."). See also Mesnick v. General Electric Co., 950 F.2d 816, 823-24 n. 5 (1st Cir.1991) ("if the employer offers a shaky, hard-to-swallow reason for its actions, logic counsels that the plaintiff's follow-on burden [to prove pretext] should become correspondingly lighter")
 
 
 [7]
 See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219 (2d Cir.1994) (question of fact existed precluding summary judgment in reduction-in-force case where plaintiff was laid-off, employer failed to interview her for new position for which she was qualified, and stated policy of employer was to find new positions for laid-off employees); Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 105 (2d Cir.1989) (question of fact existed precluding summary judgment in reduction-in-force case where plaintiff, the oldest nonclerical employee, was discharged while her staff continued to operate and number of employees actually increased, was not offered opportunity to transfer to new position, bulk of her duties were reassigned to younger employee, and employer failed to consider her for new position)