Dr. Janice W. ANDERSON,
Ph.D., Plaintiff,

v.

STATE UNIVERSITY OF NEW YORK,
College at New Paltz, Robert L. King,
in his official capacity as Chancellor
of the State University of New York,
Dr. Roger W. Bowen, in his official
capacity as President and Chief Ad-
ministrator of the State University of
New York, College at New Paltz, and
the Board of Trustees of the State
University of New York, Defendants.

No. 95–CV–0979.

United States District Court,
N.D. New York.

July 18, 2000.

4. Counsel should contact this Magistrate Judge's Chambers to arrange a settlement conference. (*See* Dkt. # 68).

Gleason, Dunn, Walsh & Oshea, Albany, NY, Ronald G. Dunn, of counsel, for plaintiff.

Attorney General of the State of New York, The Capitol, Albany, NY, Howard L. Zwickel, AAG, of counsel, for defendants.

United States Dep't of Justice, Civil Rights Division, Washington, DC, Sharon A. Seeley, AAG, of counsel, for Intervenor United States of America.

Goodman & Zuchlewski, New York City, Janice Goodman, of Counsel, for Amici Curia National Employment Lawyers Association, American Association of University Professors, The Employment Law Center, The National Partnership for Women & Families, and the National Women's Law Center Now Legal Defense & Education Fund.

## MEMORANDUM—DECISION & ORDER

McAVOY, District Judge.

Plaintiff Dr. Janice W. Anderson commenced the instant action against Defendants claiming violations of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"). Defendants previously moved pursuant to FED. R. CIV. P. 56 seeking, among other things, dismissal of the EPA claim on the ground that, pursuant to the Eleventh Amendment, Defendants were immune from suit in federal court. On December 8, 1997, the Court rendered a decision from the bench finding, among other things, that the EPA abrogated the states' Eleventh Amendment immunity. On appeal, the Second Circuit affirmed. *See Anderson v. State Univ. of New York,* 169 F.3d 117 (2d Cir.1999), *cert. granted and judgment vacated,* —— U.S. ——, 120 S.Ct. 929, 145 L.Ed.2d 807 (2000). The Supreme Court

granted *certiorari,* and vacated and remanded the Second Circuit's opinion for reconsideration in light of its decision in *Kimel v. Florida Bd. of Regents,* —— U.S. ——, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). The Second Circuit, in turn, remanded the matter back to this Court for reconsideration in light of *Kimel, Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Kilcullen v. New York State Dep't of Labor,* 205 F.3d 77 (2d Cir.2000); and *Muller v. Costello,* 187 F.3d 298 (2d Cir.1999). Presently before the Court is Defendants' renewed motion for summary judgment on the ground that the Eleventh Amendment precludes the instant EPA claim.

## I. Background

The Court will not now restate the underlying facts as they are not relevant to the narrow legal issue currently presented and they were fully set forth in the Second Circuit's opinion, familiarity with which is assumed. *See Anderson,* 169 F.3d 117.

## II. Whether the EPA Abrogated the State's Eleventh Immunity

The sole issue presented is whether the EPA abrogated the states' Eleventh Amendment immunity.

The Eleventh Amendment states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. Although the plain language of the Eleventh Amendment does not speak to federal question jurisdiction, it has been extended to cover all suits against the states regardless of their foundation. *See Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2253–54, 144 L.Ed.2d 636 (1999); *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense*

*Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2232 n. 5, 144 L.Ed.2d 605 (1999); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 1130, 134 L.Ed.2d 252 (1996). Thus, absent any exception to the states' Eleventh Amendment immunity, litigants may not use the federal courts to sue the states. *See id.*

It is undisputed that the State of New York did not waive its Eleventh Amendment immunity for actions commenced under the EPA. *See Anderson,* 169 F.3d at 119. Thus, New York is entitled to Eleventh Amendment immunity unless: (1) Congress unequivocally expressed its intent to abrogate that immunity; and (2) if it did, Congress acted pursuant to a valid grant of constitutional authority. *See Kimel,* 120 S.Ct. at 640.

### A. Whether Congress Unequivocally Expressed Its Intent to Abrogate the State's Eleventh Amendment Immunity

Defendant concedes that Congress intended to abrogate the States' sovereign immunity from suit when it extended the coverage of the EPA in 1974. *See* Def. Mem. of Law, at 11. Moreover, the legislative history supports the notion that Congress intended to subject states to suit in federal courts to enforce their rights under the Fair Labor Standards Act ("FLSA").[1] *See* H.R.Rep. No. 93–913, 93rd Cong., 2d Sess. 41, *reprinted in* 1974 U.S.C.C.A.N. 2811, 2850 ("The committee also acted . . . to make clear the right of individuals employed by state . . . governments . . . to bring private actions to enforce their rights . . . . This amendment is necessitated by the decision of the U.S. Supreme Court in [*Employees of Dept. of Public Health and Welfare, Missouri v. Dept. of Public Health and Welfare, Missouri,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973)] which held that Con-

gress in extending coverage under the 1966 amendments to school and hospital employees in state and local governments did not explicitly provide the individual a right of action in the Federal courts"). Accordingly, the Court finds that Congress intended to abrogate the states' Eleventh Amendment immunity for suits alleging violations of the EPA. *See Hale v. Mann,* 219 F.3d 61, 67 (2d Cir.2000); *see also Anderson,* 169 F.3d at 119; *Close v. New York,* 125 F.3d 31 (2d Cir.1997); 29 U.S.C. § 216(b).

### B. Whether Congress Acted Pursuant to a Valid Grant of Constitutional Authority

The next question is whether, in deciding to subject the states to suit in federal courts, Congress acted pursuant to a valid grant of constitutional authority. Congress may not abrogate a state's Eleventh Amendment immunity under its Article I powers. *See Kimel,* 120 S.Ct. at 643–44. "Section 5 of the Fourteenth Amendment ['§ 5'], however, does grant Congress the authority to abrogate the States' sovereign immunity." *Id.* at 644. "Accordingly, [Plaintiff] . . . may maintain [her EPA] suit[ ] against the State[ ] of [New York] . . . if, and only if, the [EPA] is appropriate legislation under § 5." *Id.*

When Congress originally enacted the EPA, it purported to have acted under the Commerce Clause. *See* 29 U.S.C. § 202(b) ("It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several states . . . to correct and as rapidly as practicable to eliminate the conditions . . . referred to in § 202(a)."); *see also* U.S. CONST. art. I, § 8; *Hundertmark v. State of Florida Dep't of Transp.,* 205 F.3d 1272, 1274 (11th Cir.2000). Congress was not so explicit when it enacted the 1974 amendments.[2] *See Anderson,* 169 F.3d at 119

---

1. The EPA is part of the FLSA. *See* 29 U.S.C. ch. 8.

2. It was the 1974 amendments that extended the definition of "employer" to include states.

("[I]n passing the 1974 FLSA Amendments, which extended coverage of the EPA to the states... Congress was silent as to the source of its authority"); *Varner v. Illinois State Univ.*, 150 F.3d 706, 713 (7th Cir.1998), *cert. granted and judgment vacated,* —— U.S. ——, 120 S.Ct. 928, 145 L.Ed.2d 806 (2000); *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 838 (6th Cir.1997). However, Congress's silence as to the source of its authority in enacting the 1974 amendments does not preclude a finding that the EPA is appropriate legislation under § 5. Rather, the relevant inquiry is whether Congress could have acted pursuant to § 5. *See EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 1063 n. 18, 75 L.Ed.2d 18 (1983) ("It is in the nature of our review of congressional legislation defended on the basis of Congress's powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the ex-

ercise of that power. That does not mean, however, that Congress need anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection,' for the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.") (internal quotations, citations, and alterations omitted); *see also Kilcullen*, 205 F.3d at 79.

In light of the Congressional recognition that: (1) there has been persistent gender-based wage discrimination in the United States;[3] (2) the elimination of such gender-based wage discrimination is in the public interest;[4] (3) the EPA is an employment-based civil rights law;[5] and because (4) legislation prohibiting intentional gender-based wage discrimination is proper legislation under § 5;[6] and (5) the Fourteenth Amendment's Equal Protection Clause provides constitutional protection to gender-based classifications,[7] the

---

*See* Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6, 88 Stat. 55, 58–62, 93rd Cong, 2d Sess.

3. *See, e.g.,* Report on the Activities of the Committee on Education and Labor During the 103rd Congress, H.R. Rep. 103–872, at 134, 103 Cong., 2nd Sess., 1994 WL 702776 (Dec. 13, 1994) ("Oversight hearing on the Fair Pay Act of 1994 (held jointly with the Post Office Subcommittee on Compensation and Benefits) with emphasis on the inadequacies of current legislation (the Equal Pay Act and Title VII of the Civil Rights Act) in addressing the sex and race-based wage discrimination that persists in the American workplace. The Fair Pay Act is seen as the new legislative weapon needed to achieve the goal of assuring that every American is compensated on the basis of the value of their work and not their race, gender, or nationality."); Civil Rights Act of 1990, H.R.Rep. No. 644(1), at 134, 101st Cong., 2d Sess., July 30, 1990, 1990 WL 259280 ("The Committee notes that sex-based wage discrimination is already made unlawful under Title VII and the Equal Pay Act."); *see also United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 2274, 135 L.Ed.2d 735 (1996) (recognizing the long history of gender-based discrimination in the United States).

4. *See, e.g.,* Civil Rights Act of 1991, H.R. Rep. 102–40(1), § 102, reprinted in 1991

U.S.C.C.A.N. 539, 558, 102nd Cong., 1st Sess., 1991 ("Experts have identified numerous types of employment practices which may perpetuate sex segregation and artificially limit the earnings potential of women and minorities. The Committee finds that the elimination of pay inequities based on sex ... is vital to the Nation's future economic well-being.").

5. *See, e.g.,* Balanced Budget Act of 1997, Pub.L. No. 105–33, H.R. Rep. 105–149, at 3381, 105th Cong., 1st Sess. (June 24, 1997).

6. *See, e.g.,* 42 U.S.C. § 2000e–2(a) (prohibiting, among other things, discrimination against any individual with respect to compensation because of such individual's gender); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 2282, 105 L.Ed.2d 1 (1989) (overruled on other grounds by *Seminole Tribe*, 116 S.Ct. at 1131).

7. *See Kimel*, 120 S.Ct. at 645–46, 646 ("[W]hen a State discriminates on the basis of ... gender, we require a tighter fit between the discriminatory means and the legitimate ends they serve.") (citing *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)).

Court finds that, much like Title VII, Congress could have acted pursuant to its § 5 powers when enacting the EPA and extending its application to the states. *See, e.g., Union Gas Co.*, 109 S.Ct. at 2282 ("In *Fitzpatrick v. Bitzer*, ... we held that Congress may subject States to suits for money damages in federal court when legislating under § 5 of the Fourteenth Amendment, and further held that Congress had done so in the 1972 Amendments to Title VII of the Civil Rights Act of 1964."). In other words, "the *objectives* of the legislation are within Congress' power under the amendment." *Varner*, 150 F.3d at 712–714.

Having found that Congress could have acted under its § 5 powers in enacting the EPA, the next question is whether the EPA falls within the scope of Congress' § 5 enforcement powers. This involves a determination of whether the EPA is remedial (rather than substantive) legislation that evinces both "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997).

Defendant argues that the EPA is unconstitutional substantive legislation because it imposes strict liability (subject to certain affirmative defenses) and does not require a showing of intentional discrimination, whereas a plaintiff seeking redress for gender-based discrimination under the Fourteenth Amendment's Equal Protection Clause must demonstrate intentional discrimination. Defendant further contends that, because the EPA will prohibit some conduct that would not, in and of itself, be unconstitutional, it constitutes substantive, rather than remedial, legislation. According to Defendant, this alteration of the burdens of proof and of the necessity of proving intent draws the EPA out of the realm of constitutional remedial legislation and into the domain substantive legislation adding to the Fourteenth Amendment's protections, something Congress may not do under § 5. Plaintiff, the United States, and the amici respond that the EPA is proper remedial legislation because Congress designed it to remedy a pervasive evil it identified (gender-based wage discrimination) and because the nature of an EPA claim does not substantively alter the protections of the Fourteenth Amendment, particularly in light of the heightened scrutiny courts afford gender-based classifications under the Fourteenth Amendment.

The evil, or injury, to be prevented or remedied by the EPA is obvious—gender-based discrimination in the payment of wages. The legislative history of the EPA supports this notion, *see* Equal Pay Act of 1963, H.R.Rep. No. 309, 88th Cong, 1st Sess. (May 20, 1963); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) ("Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry—the fact that the wage structure of 'many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.'" (quoting S.Rep. No. 176, 88th Cong., 1st Sess., 1 (1963))), as does the plain language of the statute itself. *See* 29 U.S.C. § 206(d). This evil is also one protected by the Fourteenth Amendment's Equal Protection Clause. *See U.S. v. Morrison*, —— U.S. ——, 120 S.Ct. 1740, 1755, 146 L.Ed.2d 658 (2000) ("As our cases have established, state-sponsored gender discrimination violates equal protection unless it serves important governmental objectives and ... the discriminatory means employed are substantially related to the achievement of those objectives.") (internal quotations and citations omitted); *see also Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir.1987) ("[W]omen complaining of pay discrimination can ... sue under 42 U.S.C. § 1983 for viola-

tion of the equal protection clause, provided ... that the discrimination was deliberate.").

Further, the extent of this evil also is obvious. As noted, in passing the EPA and in subsequent statements by Congress, Congress recognized the pervasiveness of gender-based discrimination in the payment of wages. *See* n. 3, 4, 5 *supra; see also Kilcullen,* 205 F.3d at 80 (courts may consider the legislative record compiled after passage of the subject legislation). Moreover, it is evident that gender-based wage discrimination is not limited to the private sector, as the myriad of cases wherein a plaintiff has alleged gender-based wage discrimination against a public employer make clear (especially, it seems, where, as here, the public employer is a university). *See, e.g., Holman v. State of Indiana,* 211 F.3d 399 (7th Cir.2000); *Hundertmark,* 205 F.3d 1272; *Hibschman v. Regents of Univ. of Maryland Systems,* 208 F.3d 209 (4th Cir.2000) (table, text in Westlaw); *Weaver v. Ohio State Univ.,* 194 F.3d 1315, 1999 WL 824677 (6th Cir.1999) (table, text in Westlaw); *O'Sullivan v. State of Minnesota,* 191 F.3d 965 (8th Cir. 1999); *Anderson,* 169 F.3d 117; *Ussery v. State of Louisiana,* 150 F.3d 431 (5th Cir. 1998), *cert. dismissed,* 526 U.S. 1013, 119 S.Ct. 1161, 143 L.Ed.2d 225 (1999); *Morgan v. Kimbrough,* 133 F.3d 928, 1997 WL 813116 (9th Cir.1997) (table, text in Westlaw), *cert. denied,* 525 U.S. 835, 119 S.Ct. 93, 142 L.Ed.2d 74 (1998); *see also* Pub.L. No. 92–261, 86 Stat. 103 (1972) (extending Title VII's protections (including discrimination on account of gender) to the states). Because the EPA is aimed at preventing and/or remedying gender-based wage discrimination (something against which the Equal Protection Clause also protects), it is congruent, or harmonious, with the protections of the Fourteenth Amendment's Equal Protection Clause. This leaves the question of whether there is a proper relation (or proportionality) between the remedial scheme established by the EPA and gender-based wage discrimination.

Defendant correctly notes that, unlike Title VII or a claim under 42 U.S.C. § 1983 claiming a violation of the Fourteenth Amendment's Equal Protection Clause, the EPA does not require proof of intent. *See Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999). "Under the [EPA] once a plaintiff makes out a prima facie case, she need not prove a discriminatory animus on her employer's part. Instead, the statute affords the employer four affirmative defenses and the burden of persuasion shifts to the employer to prove the disparity is justified by one of these defenses." *Id.* A prima facie case is established by showing (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. *See id.* If a plaintiff established the prima facie case, there is a presumption of discrimination. *See id.* at 136. To avoid liability, the burden of persuasion shifts to the defendant/employer to prove that "the wage disparity is justified by one of the affirmative defenses provided under the Act: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Id.* (quoting 29 U.S.C. § 206(d)(1)). "Further, to successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." *Id.* (citing *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 526–27 & n. 1 (2d Cir.), *cert. denied* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992); *EEOC v. J.C. Penney Co., Inc.,* 843 F.2d 249, 253 (6th Cir.1988)). Thus, there is a difference in a gender-based discrimination claim under the Fourteenth Amendment and one under the EPA. However, for the following reasons, the Court finds that, on balance, this difference is not substantial and does not render the EPA an unconsti-

tutional substantive addition to the protections of the Fourteenth Amendment.

As noted, the evil here (disparate treatment in the payment of wages on account of gender) has been identified as a pervasive one both in the private and public sector. The remedy afforded by the EPA is limited solely to redressing that evil. The EPA speaks only to the payment of equal wages for equal work regardless of gender and does not otherwise implicate the employment relationship. The fact that the EPA is a type of strict liability statute—in that, once a plaintiff has established a prima facie case, the burden of proof shifts to the defendant to establish one of the several affirmative defenses—does not unduly create new substantive rights under the Fourteenth Amendment in light of the intermediate scrutiny applied to gender-based classifications. Under this level of constitutional scrutiny, the obligation is on the government to demonstrate that the state-sponsored gender discrimination serves important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objectives. *See Morrison*, 120 S.Ct. at 1755; *Virginia*, 116 S.Ct. at 2275 ("To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.' The burden of justification is demanding and it rests entirely on the State."); *Mississippi Univ. for Women*, 102 S.Ct. at 3335 ("[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification"). Although there is a difference between the obligations on the employer in defending a gender discrimination claim under the Fourteenth Amendment and the EPA, this difference is insufficient to render the EPA substantive, rather than remedial, legislation.[8] *See County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 2248, 68 L.Ed.2d 751 (1981) ("The fourth affirmative defense of the [EPA] ... was designed ... to confine application of the Act to wage differentials attributable to sex discrimination."); *City of Boerne*, 117 S.Ct. at 2163 ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional"). In this regard, the Court adopts the

**8.** In an "ordinary" discrimination claim under Title VII or pursuant to 42 U.S.C. § 1983 claiming a violation of the Fourteenth Amendment, courts employ the familiar burden shifting analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (assuming without deciding that the framework for evaluating the relative burdens of the parties in a Title VII suit is applicable to race-discrimination-in-employment claims brought under Section 1983); *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.1998). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, —— U.S. ——, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). In certain types of discrimination claims under Title VII, however, (those known as "mixed-motive" claims) "the burden of proof, and not merely the burden of production, passes to the defendant. The defendant can then escape liability only by showing by a preponderance of the evidence that, even without the presence of the illegitimate factor, the decision would have been the same." *Stratton v. Department for the Aging for the City of New York*, 132 F.3d 869, 878 (2d Cir.1997) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1790–91, 104 L.Ed.2d 268 (1989)). The mixed-motive analysis is not significantly different from that under the EPA where, once the plaintiff demonstrates a *prima facie* case, the burden of persuasion shifts to the defendant to prove an affirmative defense in order to escape liability.

reasoning in *Hundertmark,* 205 F.3d 1272; *Anderson,* 169 F.3d 117; and *Varner,* 150 F.3d 706, which need not be restated here.

Nothing in *Kimel* alters this result. *Kimel* is most notably distinguishable because it involved age-based, rather than gender-based, discrimination. As the *Kimel* Court made quite clear, *unlike gender,* "age is not a suspect classification under the Equal Protection Clause." *Id.,* 120 S.Ct. at 646. Thus, age-based classifications will be upheld if they are rationally related to a legitimate state interest. Classifications that are not suspect classifications under the Equal Protection Clause are presumed rational. *See Kimel,* 120 S.Ct. at 646. Because the ADEA would have precluded a broad range of governmental action that would otherwise be constitutional under the Fourteenth Amendment, the *Kimel* Court found it to be a disproportionate response to unconstitutional behavior. As the *Kimel* Court stated with respect to the ADEA, "[m]easured against the rational basis standard of our equal protection jurisprudence, the ADEA plainly imposes substantially higher burdens on state employers. Thus, although it is true that the existence of the [bona fide occupational qualification] defense makes the ADEA's prohibition of age discrimination less than absolute, the Act's substantive requirements nevertheless remain at a level akin to our heightened scrutiny cases under the Equal Protection Clause." *Kimel,* 120 S.Ct. at 648. Accordingly, it would substantively alter the protections of the Fourteenth Amendment for Congress to pass legislation that materially alters the burdens on the government to justify its actions. *See City of Boerne,* 117 S.Ct. at 2171 (legislation requiring states to demonstrate a compelling governmental interest and employing the least restrictive means of furthering that interest was beyond Congress' § 5 powers where the Constitution did not require such stringent proof); *see also Florida Prepaid,* 119 S.Ct. at 2206.

Here, however, we are dealing with gender discrimination. Unlike the presumption of rationality accorded age-based classifications, there is a "strong presumption that gender-based legal distinctions are suspect." *Miller v. Albright,* 523 U.S. 420, 118 S.Ct. 1428, 1442, 140 L.Ed.2d 575 (1998). This presumption imposes upon the states the burden of demonstrating that gender-based classifications serve an important governmental objective and that the discriminatory means employed are substantially related to the achievement of those objectives. *See Mississipi Univ. for Women,* 102 S.Ct. at 3335. In light of this presumption afforded gender-based classifications and the burden placed on the states, it is not so out of proportion to remedy gender-based wage discrimination for Congress to impose upon the states the burden of proving an affirmative defense in order to avoid liability once the plaintiff has initially made out a prima facie case under the EPA. Requiring the states to prove any of several affirmative defenses in order to avoid EPA liability is in line with the dictates of the equal protection jurisprudence previously discussed.

Thus, in light of: (1) the clear pattern of gender-based wage discrimination in the public sector; (2) the heightened protection afforded gender-based classifications by the Fourteenth Amendment; (3) the fact that the EPA and the Equal Protection Clause both require the government to prove the legitimacy of its acts; and (4) the fact that the EPA is limited solely to redressing gender-based wage discrimination and does not otherwise implicate the employment relationship, the Court finds that the EPA is congruent with the aims of the Equal Protection Clause and proportional to the injury to be remedied thereunder. Accordingly, the EPA is a valid exercise of Congress' powers under § 5 of the Fourteenth Amendment and, as such, the states' Eleventh Amendment immunity has been validly abrogated.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DE-NIED. In light of the fact that the Court's opinion involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from this Order may materially advance the ultimate termination of the litigation, the Court further finds that the parties may immediately appeal this matter to the Second Circuit pursuant to 28 U.S.C. § 1292(b).

**IT IS SO ORDERED**