Julia V. ESMILLA, Plaintiff,

v.

The COSMOPOLITAN CLUB, Defendant.

No. 09 Civ. 10169(DF).

United States District Court, S.D. New York.

March 26, 2013.

Felix Boy Q. Vinluan, Law Office of Felix Q. Vinluan, Woodside, NY, for Plaintiff.

Daniel T. Hughes, Litchfield Cavo, New York, NY, for Defendant.

### MEMORANDUM AND ORDER

DEBRA FREEMAN, United States Magistrate Judge.

In this diversity action, which is before me on consent pursuant to 28 U.S.C. § 636(c), plaintiff Julia Esmilla ("Plaintiff") claims that her employment as the Comptroller of defendant The Cosmopolitan Club ("Defendant" or the "Club") was terminated in retaliation for her complaints to her supervisors that, in her view, management was using, or intending to use, certain funds in a manner that violated the New York State Labor Law. Plaintiff also alleges that Defendant failed to pay her a guaranteed annual bonus of $10,000. Currently before the Court is Defendant's motion for summary judgment dismissing all of Plaintiff s claims. (Dkt. 32.) For the reasons *discussed* below, Defendant's motion for summary judgment is granted in part and denied in part.

### BACKGROUND

#### A. *Factual Background* [1]

##### 1. *Plaintiff's Initial Employment With Defendant*

The Club is a private organization whose members are exclusively women. (*See* Statement of Facts Pursuant to Civil Local Rule 56.1, dated May 31, 2012 (Dkt. 34) ("Def. 56.1 Stmt.") ¶ 2; Counter–Statement of Facts Pursuant to Local Rule 56.1, dated July 15, 2012 (Dkt. 38) ("Pl. 56.1 Stmt.") ¶ 2.) The Club's former General Manager, Rita Evans ("Evans"), hired Plaintiff in August 2005 to serve as the Club's Comptroller. (*See* Def. 56.1 Stmt. ¶ 1; Pl. 56.1 Stmt. ¶ 1.) Plaintiff claims that she was hired at an annual salary of $100,000, with a guaranteed annual bonus of at least $10,000. (Pl. 56.1 Stmt., at 8 ¶ 1.)

The parties do not dispute that Plaintiff's first year was largely a success. Plaintiff's first annual review, conducted on November 10, 2006, by Evans and the Club's Treasurer, Janet Offensend ("Offensend"), acknowledged several of Plaintiff's accomplishments. (*See* Def. 56.1 Stmt. ¶ 6; Pl. 56.1 Stmt. ¶ 6; Affidavit in Opposition to Summary Judgment Motion by Julia V. Esmilla, dated July 15, 2012 (Dkt. 39) ("Pl. Aff."), Ex. 1, at 1.) Nonetheless, for the 2006 year, Plaintiff contends that she only received a bonus of $6,000. (Pl. Aff., ¶ 19.)

The record does not contain a copy of any second annual review that Plaintiff may have been given, although it does contain a memorandum to Plaintiff, dated April 16, 2007, from JoAnn Goodspeed, the Finance Committee Chair, and Betsy Maas ("Maas"), the Acting Human Re-

---

1. The undisputed facts summarized herein are taken from the parties' respective statements pursuant to Local Civil Rule 56.1 (which have been duly supported with citations to the record), as well as the affidavits, deposition testimony, and other evidence that the parties have submitted. To the extent the parties' Rule 56.1 statements or the evidence reveals disputed issues, the Court has laid out both parties' versions of the underlying facts.

sources Manager, documenting certain billing errors. (Declaration of Daniel T. Hughes, dated May 31, 2012 (Dkt. 33) ("Hughes Decl."), Ex. P.) This memorandum set performance goals for Plaintiff to improve accuracy and timeliness in monthly billing and the delivery of monthly financials. (*See id.*) Other than this, there is no documentary evidence in the record reflecting that the Club had any issues with Plaintiff's performance until the end of 2007.

## 2. *Plaintiff's Alleged Complaints Regarding the "Pegasus Fund"*

Plaintiff contends that, starting in December 2007, she began to complain about some of management's practices regarding the use of monies in a fund called the "Pegasus Fund." According to Plaintiff, members of the Club paid annual dues (*see* Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Stmt. ¶ 2), and, in addition, both member and nonmember patrons of the Club paid certain service charges for taking advantage of various services offered by the Club, including dining, events, and overnight stays (*see* Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Stmt. ¶ 2). Plaintiff contends that, as tipping of Club staff was expressly prohibited (*see* Def. 56.1 Stmt. ¶ 5; Pl. 56.1 Stmt. ¶ 5), both Club patrons and staff understood that these service charges were being paid in lieu of direct gratuities (*see* Pl. 56.1 Stmt., at 8–91 ¶¶ 3–5), and thus, according to Plaintiff, the charges were supposed to be distributed to the staff, pursuant to the requirements of the New York Labor Law. The service charges, however, together with certain contributions by Club members, were paid into the Pegasus Fund (*see* Def. 56.1 Stmt. ¶ 3; Pl. 56.1 Stmt. ¶ 3), which was then not simply distributed to staff, but rather was used to benefit Club employees and others in a number of ways (*see* Def. 56.1 Stmt. ¶ 4). The Pegasus Fund was traditionally used, for example, to pay for Thanksgiving turkeys, year-end gifts, retirement gifts, and employee training. (*Id.*)

Plaintiff claims that, following a December 3, 2007 meeting of the Pegasus Fund Committee, which oversaw the Pegasus Fund, the Club's General Manager, Chrisian Dewailly ("Dewailly") instructed her to prepare a budget for fiscal year 2008–2009 that would have diverted a portion of the Pegasus Fund to the Club's Food and Beverage account. (*See* Pl. 56.1 Stmt., at 9 ¶ 7.) Plaintiff believed that such a budget would violate New York law, an objection she claims to have voiced to Dewailly. (*See* Pl. Aff. ¶¶ 40–42, 46.) Plaintiff also claims that, on more than one occasion during the period from December 2007 to early February 2008, she informed Dewailly that several of the Club's existing practices relating to the Pegasus Fund violated New York law. (*See* Pl. Aff. ¶¶ 42, 46.) More specifically, Plaintiff claims that, during this period, she objected to the practice of commingling service charges with solicited donations, as well as the Club's distribution of the commingled funds as year-end and retirements gifts. (*See* Pl. Aff. ¶ 42; Pl. 56.1 Stmt., at 9 ¶¶ 9–10; *see also id.* ¶¶ 38–39 (attesting that she told Dewailly that the Pegasus Fund had been used to fund substantial severance packages for, among others, the Club's former Assistant Manager, former Comptroller, and former General Manager).) According to Plaintiff, she suggested that the Club instead pass the proceeds from the service charges directly to the Club's employees. (*See* Pl. 56.1 Stmt., at 9 ¶¶ 9–10; Pl. Aff. ¶¶ 42, 60.)

## 3. *Plaintiff's Termination*

On February 14, 2008, Plaintiff's employment was terminated at a meeting attended by Dewailly, Offensend, and Maas. (*See* Def. 56.1 Stmt. ¶ 24; Pl. 56.1 Stmt.

¶ 24; Pl. Aff. Ex. 6 (Letter to Plaintiff from Dewailly, dated Feb. 14, 2012 (Dkt. 39–6) ("Termination Letter") (letter signed by Plaintiff, Dewailly, Offensend, Maas, stating that Plaintiff's last day of employment at the Cosmopolitan Club was February 14, 2008).) The parties do not dispute that the termination decision was made collaboratively by Dewailly and the Club's Executive Committee (*see* Def. 56.1 Stmt. ¶ 22; Pl. 56.1 Stmt. ¶ 22), but they do dispute the reasons for Plaintiff's termination. Plaintiff claims that she was fired in retaliation for having complained to Dewailly about company practices that she believed were illegal (Def. 56.1 Stmt. ¶ 25; Pl. 56.1 Stmt. ¶ 25), while Defendant asserts that Plaintiff was fired for performance reasons, particularly relating to her purported harassment of her subordinates (Def. 56.1 Stmt. ¶¶ 6–24).

In support of its position, the Club has submitted a series of emails, starting in December 2007, memorializing complaints about Plaintiff's performance and management's decision to address those complaints by terminating Plaintiff's employment. These emails include, among others:

(1) an email dated December 20, 2007, from Dewailly to Plaintiff, telling Plaintiff not to raise her voice to her employees and stating that "drastic action" would be taken if such behavior continued;

(2) an email dated January 21, 2008, from Maas to Molly Parkinson ("Parkinson"), the Club's President, describing the results of meetings with members of the accounting department that Plaintiff supervised; stating, *inter alia*, that Plaintiff had "yelled at, criticized and publicly humiliated her direct reports in such a

way that one of our trusted employees felt she had to resign to avoid the 'poison[ous] atmosphere' in the office and the other is reduced to tears on a regular basis"; further stating that, while the Club could employ its "progressive discipline approach," doing so "would take too long"; and recommending Plaintiff's termination for harassment;

(3) an email dated January 21, 2008, from Parkinson to other members of the Club's Board of Governors, forwarding Maas's email of the same date, and adding that Parkinson "want[ed] to act," and that, if the Board concurred, she would "make an appointment with [Dewailly] to deliver the message";

(4) an email dated January 29, 2008, from Parkinson to Offensend and Maas, recounting a meeting with Dewailly, and stating "He gets it. He knows that we want him to move and I am inclined to let him do it at his pace"; and

(5) an email dated January 29, 2008, from Parkinson to Offensend, stating that Parkinson hoped that Offensend would be "reinforcing the Executive Committee directives to [Dewailly] that we want the dismissal of the comptroller [ *i.e.*, Plaintiff] to be his first priority and that we do not want her as our employee acting as she has been."

(Hughes Decl. Ex. E (transcript of Plaintiff's continued deposition, conducted May 13, 2011 ("5/13/11 Pl. Dep."), 53:4–10 (describing Dec. 2007 email)); *id.* Ex. K, at CC 00498, CC 00500, CC 00501; *see also* Def. 56.1 Stmt. ¶¶ 14–16 (referencing Ex. K).) [2]

---

2. As noted above and discussed further below, Defendant has submitted copies of a number of emails in support of its motion. Plaintiff has also submitted copies of emails with her

In addition, the Club has submitted a memorandum dated January 29, 2008, purportedly prepared by Maas, and entitled "Managerial Issues." (Hughes Decl. Ex. N; *see also* Def. 56.1 Stmt. ¶ 23 (referencing the "Managerial Issues" memorandum); Pl. 56.1 Stmt. ¶ 23 (same).) The memorandum details numerous complaints from Plaintiff's subordinates regarding her managerial style, and concludes that Plaintiff was a "poor communicator, not able to lead," that Plaintiff "exhibit[ed] poor judgment," and that she was "divisive and unprofessional as a manager of a department." (Hughes Decl. Ex. N.) Plaintiff objected to all of the memorandum's complaints and its conclusions. (*See* Def. 56.1 Stmt. ¶ 23; Pl. 56.1 Stmt. ¶ 23.)

### B. *Procedural History*

Plaintiff commenced her action in this Court on December 14, 2009, alleging retaliation under Section 215 of New York Labor Law and seeking relief in excess of $10 million. (*See generally* Complaint, dated Dec. 14, 2009 ("Compl.") (Dkt. 1).) The Club filed its Answer on January 25, 2010. (Dkt. 4.) On July 19, 2010, Plaintiff moved for leave to amend her Complaint to add claims for breach of contract and failure to pay wages under Article 6 of New York Labor Law. (Dkt. 13.) The Court granted leave to amend on March 3, 2011, 2011 WL 814007 (Dkt. 22), and, on March 22, 2011, Plaintiff filed an Amended Complaint ("Am. Compl.") (Dkt. 24). The Club filed an Amended Answer on June 1, 2011. (*See* Hughes Decl. Ex. 2 (Amended Answer (Dkt. 33-2)).)

On May 31, 2012, the Club moved for summary judgment on all of Plaintiff's claims. (Dkt. 32.) Focusing principally on Plaintiff's claim that she was fired, at least

in part, for complaining about the budget that Dewailly had allegedly instructed her to prepare, the Club contends that Plaintiff's retaliation claim must fail because (1) Plaintiff did not have a reasonable belief that the budget Dewailly requested for fiscal year 2008–09 would have violated the New York Labor Law; (2) the Board was unaware of Plaintiff's complaint about the budget; and (3) Plaintiff cannot demonstrate a causal nexus between any such complaint and her termination. (*See* Memorandum of Law in Support of Motion to Dismiss the Amended Complaint and for Summary Judgment, dated May 31, 2012 ("Def. Mem.") (Dkt. 35), at 4–8.) Regarding Plaintiff's breach-of-contract claim, the Club claims that its alleged oral agreement to pay Plaintiff a guaranteed bonus cannot be enforced, as any such agreement would violate the Statute of Frauds. (*See id.* at 8–9.) Finally, the Club argues that Plaintiff's claim for failure to pay wages under Article 6 of New York Labor Law must fail because a bonus cannot be considered "earned wages" under the statute. (*See id.* at 10.)

Plaintiff filed an opposition on July 15, 2012, arguing that she had submitted evidence sufficient to establish a *prima facie* case of retaliation under Section 215 of New York Labor Law, and that the Club's assertion that she was terminated for harassing her subordinates should be disregarded as pretextual. (*See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated July 15, 2012 (Dkt. 37) ("Pl. Mem."), at 6–12.) Plaintiff's opposition fails to address the Club's contentions regarding her claims for breach of contract or failure to pay wages under Article 6 of New York

---

opposition papers, but some of those emails are entirely illegible. (*See* Pl. Aff. Ex. 7.) On March 20, 2013, my Chambers contacted

Plaintiff's counsel to ask him to look into this, but, to date, counsel has not responded to the Court's inquiry.

Labor Law. Defendant has not filed a reply.

## *DISCUSSION*

### I. *APPLICABLE LEGAL STANDARDS*

#### A. *Rule 56*

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may be granted when the parties' sworn submissions show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996). The moving party bears the burden of showing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Accordingly, the Court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.,* 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Nonetheless, the party opposing summary judgment "may not rely merely on allegations or denials in its own pleading," but "must ... set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). This means that "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated specu-

lation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998)), but, rather, must present "significant probative evidence tending to support the complaint." *Smith v. Menifee,* 00 CIV. 2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 26, 2002) (citing *First Natl. Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

In sum, the Court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir.1967); *accord Flaherty v. Lang,* 199 F.3d 607, 615 (2d Cir.1999). Where there is no genuine issue of material fact, viewing the evidence in the light most favorable to the nonmoving party, summary judgment is appropriate. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505.

#### B. *Local Rule 56.1*

Under this Court's local rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. 56.1(a).[3] "The purpose of Local Rule 56.1 is to streamline the consideration of sum-

---

**3.** If the opposing party fails to respond to the moving party's Rule 56.1 Statement, then the material facts contained in the moving party's statement are deemed admitted as a matter of law. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *see also* Local Civ. 56.1(c) ("Each numbered paragraph in

the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

mary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 74 (2d Cir.2001). Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law. *Id.* Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004); *see also Holtz,* 258 F.3d at 74; *Zerafa v. Montefiore Hosp. Hous. Co.,* 403 F.Supp.2d 320, 329 n. 12 (S.D.N.Y. 2005). Summary judgment may only be granted where the Court is satisfied that the undisputed facts, as supported by the record, "show that the [movant] is entitled to a judgment as a matter of law." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996) (quoting Fed.R.Civ.P. 56(c)).

## II. *DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

The Club moves for summary judgment on all of Plaintiff's claims, which are addressed in turn below.

### A. *Plaintiff's Retaliation Claim*

Plaintiff brings her retaliation claim under Section 215 of the New York Labor Law, which was twice amended, after the date when Plaintiff's claim accrued. It was amended, in 2009, to "expand the categories of conduct" that it covers,[4] and then again, in 2010, to "close loopholes on what actions constitute prohibited retaliation."[5] The amendments were not made retroactive, however,[6] and thus this Court will evaluate Plaintiff's claim under the law as it stood at the relevant time. At that time, Section 215 stated, in pertinent part:

No employer ... shall discharge, penalize, or in any other manner discriminate against any employee because such employee has made a complaint to his employer ... that the employer has violated any provision of this chapter [the Labor Law]....

N.Y. Lab. Law § 215(1) (McKinney 2008).

To establish a *prima facie* case of retaliation under this provision, a plaintiff must be able to show that, "while employed by the defendant, he or she made a complaint about the employer's violation of New York Labor Law and was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result." *Hi-*

---

4. *See* Memorandum in Support of Legislation, Bill Jacket, L. 2009, ch. 372, Summary of Provisions (Westlaw) (stating that this amendment would "expand the categories of conduct protected against employer retaliation for complaints concerning wage and other labor law violations").

5. *See* Introducer's Memorandum in Support, Bill Jacket, L. 2010, ch. 564, § 10 (Westlaw) (stating that this amendment would "[c]lose[ ] loopholes on what actions constitute prohibited retaliation" by, *inter alia,* "protect[ing] an employee from retaliation where the employee makes a complaint about conduct that the employee reasonably and in good faith be-

lieves constitutes a violation under the Labor Law").

6. The enabling language for the 2009 amendment states that the amendment "shall take effect on the ninetieth day after it shall have become a law, and shall apply to offenses committed on or after such effective date." 2009 N.Y. Laws ch. 372, § 4 (McKinney). As to the 2010 amendment, the enabling language states that "the act shall take effect on the one hundred twentieth day after it shall have become a law." 2010 N.Y. Laws ch. 564, § 17 (McKinney). The 2009 amendment became effective on November 24, 2009; the 2010 amendment, on April 9, 2011.

gueros v. New York State Catholic Health Plan, Inc., 526 F.Supp.2d 342, 347 (E.D.N.Y.2007). Further, there must be "a nexus between the employee's complaint and the employer's retaliatory action." Id.; see also Quintas v. Pace Univ., 23 A.D.3d 246, 804 N.Y.S.2d 67, 68 (1st Dep't 2005). Once the plaintiff establishes a prima facie case of retaliation under Section 215, the burden shifts to the defendant to produce evidence suggesting that it had a legitimate, non-retaliatory explanation for its actions. See Lin v. Great Rose Fashion, Inc., No. 08–cv–4778 (NGG)(RLM), 2009 WL 1544749, at *17 (E.D.N.Y. June 3, 2009). The plaintiff must then persuade the finder of fact that the proffered explanation is pretextual. See Copantitla v. Fiskardo Estiatorio, Inc., 788 F.Supp.2d 253, 302 (S.D.N.Y. 2011).[7]

In this case, Plaintiff has come forward with sufficient evidence to support a prima facie case of unlawful retaliation and to raise a genuine triable issue of fact as to whether Defendant's proffered reason for her termination was pretextual.

### 1. Plaintiff's Prima Facie Case of Unlawful Retaliation

#### a. Evidence That Plaintiff "Made a Complaint"

■ As noted above, Defendant focuses its motion on Plaintiff's purported complaint regarding the budget Dewailly allegedly instructed her to prepare, and pays little attention to Plaintiff's additional assertions that she made other complaints regarding management's ongoing uses of the Pegasus Fund. As to Plaintiff's alleged complaint regarding the budget, Defendant asserts that Plaintiff's claim under Section 215 cannot be sustained because, Defendant states, it lacked "general corporate knowledge" of Plaintiff's complaint, and Plaintiff failed to complain to someone "whose job it was to investigate and resolve such complaints." (See Def. Mem., at 5–6 (citing Philippeaux v. Fashion Institute of Technology, No. 93 Civ. 4438, 1996 WL 164462, at *9 (S.D.N.Y. Apr. 9, 1996)).) While such a requirement may be found in various federal statutes, this Court has previously noted that, "[u]nlike its federal analogue, the [New York Labor Law's] anti-retaliation provision unquestionably protects informal complaints made to an employer." Duarte v. Tri–State Physical Med. & Rehab., P.C., No. 11 Civ. 3765(NRB), 2012 WL 2847741, at *3 (S.D.N.Y. July 11, 2012); see also Barturen v. Wild Edibles, Inc., No. 07 Civ. 8127(LLS), 2007 WL 4468656, at *5 (S.D.N.Y. Dec. 18, 2007) (plaintiff's oral complaint to supervisor suffices).

Here, the record reflects that, as part of Plaintiff's first annual review, her superiors specifically explained that, despite the "special relationship that a comptroller will always have with the Club's officers and Governors, the Club's manager is ultimately responsible for every aspect of the Club's functioning, including the finances."

---

7. As Section 215 of the New York Labor Law and Section 15(a) of the Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 15(a)(3), are "nearly identical" provisions, see Perez v. Jasper Trading, Inc., No. 05 Civ. 1725(ILG), 2007 WL 4441062, at *7 (E.D.N.Y. Dec. 17, 2007) (finding it acceptable to rely on cases analyzing FLSA retaliation claim when adjudicating similar claims under the NYLL), the familiar "burden-shifting" framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which is used by courts to analyze FLSA retaliation claims at the summary judgment stage, is also appropriately used to analyze claims under NYLL § 215, see Torres v. Gristede's Operating Corp., 628 F.Supp.2d 447, 471 (S.D.N.Y.2008) ("Though the Court addresses Plaintiffs' retaliation claims under FLSA § 15(a)(3), its analysis is also applicable under NYLL § 215.").

(*See* Pl. Aff. Ex. 1 (Annual review of Plaintiff, dated Nov. 10, 2006), at 2.) The parties do not dispute that Dewailly, who served as the Club's General Manager, was Plaintiff's supervisor. (*See* Def. Mem., at 5 (stating that Dewailly was Plaintiff's "immediate supervisor"); Pl. Mem., at 12 (same).) As a matter of law, then, if Plaintiff made informal complaints to Dewailly, then Section 215 would have required her to do no more.

Plaintiff testifies, by affidavit, that, in December 2007, she did complain to Dewailly about his request that she prepare a budget that, in her view, would violate the state labor laws. (Pl. Aff. ¶¶ 41–42.) Further, Plaintiff attests that she "emphatically advised ... Dewailly that the service charges meant in lieu of tips or gratuities for the service employees [should] be directly given to said service employees and not be used to fund severance payments and Christmas bonuses." (Pl. Aff. ¶ 42.) Plaintiff adds that, in early January 2008, she again "explained [to Dewailly] that funneling monies out of the Pegasus Fund that were meant in lieu of tips and gratuities ... for the service employees to an account to be used for the Club's operations would be unlawful." (Pl. Aff. ¶ 46.) Finally, Plaintiff states that, "[o]n or about February 5, 2008," she "reiterated [her] suggestion [to Dewailly] that all tips, gratuities and service charges be directly given to service employees and not be commingled with the Christmas donations in the Pegasus Fund." (Pl. Aff ¶¶ 58–60.) If, as Plaintiff asserts, she complained to Dewailly, even informally, about the illegality of the Club's use of the Pegasus Fund, then Plaintiff should be found to have "made a complaint," within the meaning of Section 215.[8]

### b. *Evidence That Plaintiff Complained of a "Colorable Violation" of Law*

■ Defendant next argues that Plaintiff cannot make out a *prima facie* case of retaliation because her alleged complaints were not based on a colorable violation of New York Labor Law, (*See* Def. Mem., at 7.) This argument is persuasive, in part.

As a preliminary matter, the Court notes that Defendant specifically argues that Plaintiff did not have a "reasonable and good faith belief in a violation of the Labor Law." (Def. Mem., at 5.) The language used by Defendant, however, appears to be taken from a 2010 amendment of Section 215. *See* 2010 N.Y. Laws ch. 564, § 17 (McKinney) (quoted *supra* at n. 4). The version of Section 215 applicable to this action did not give rise to claims based on "good faith belief," but rather, as stated above, afforded protection to employees who complained "that the employer ha[d] violated" a provision of New York Labor Law. N.Y. Lab. Law § 215(1) (McKinney 2008). It should also be noted that this applicable version of the statute did not obligate Plaintiff "to tell her employer which section of the law she thought was being violated." *Veerman v. Deep Blue Group L.L.C.*, No. 08 Civ. 5042(WHP)(LAB), 2010 WL 4449067, at *3 (S.D.N.Y. Nov. 3, 2010) (citing *Epifani v. Johnson*, 65 A.D.3d 224, 882 N.Y.S.2d 234, 244 (2d Dep't 2009)). " '[A]ll that [was] required [was] that the complaint to the employer be of a colorable violation of the statute.' " *Castagna v. Luceno*, No. 09 Civ. 9332(CS), 2011 WL 1584593, at *21

---

8. Moreover, although state law would not have required Plaintiff to address her complaints to the Board of Governors, the Court notes that, when asked at her deposition if she had ever protested the Club's practice of using the Pegasus Fund to fund severance packages, Plaintiff testified that she had complained about this to Offensend, who is a member of the Club's Board of Governors. (*See* 5/13/11 Pl. Dep., at 15:22–16:3.)

(S.D.N.Y.2011) (quoting *Weiss v. Kaufman*, No. 103473/2010, 2010 WL 4858896, at *2, 2010 N.Y. Misc. LEXIS 5699, at *4 (N.Y.Sup.Ct. Nov. 22, 2010)).[9]

In this case, Plaintiff claims that she complained about Dewailly's instruction to prepare a budget that would divert proceeds from the Pegasus Fund to the Club's Food and Beverage account. (*See* Am. Compl. ¶ 83; Pl. Aff. 41, 46, 69.) Plaintiff also claims to have complained about several Club practices related to the Pegasus Fund, including the Club's alleged: (1) commingling of service charges with Christmas donations (Am. Compl. ¶ 79; Pl. Aff. ¶¶ 42, 60, 69); (2) failure to distribute service charge proceeds directly to employees (Am. Compl. ¶ 80; Pl. Aff. ¶¶ 42, 60, 69); (3) funding of severance packages with proceeds from the service charges (Am. Compl. ¶ 81; Pl. Aff. ¶ 42, 69; 5/13/11 Pl. Dep., at 83:22–25, 85:12–14); and (4) funding of Christmas bonuses with proceeds from the service charges (Am. Compl. ¶ 82; Pl. Aff. ¶¶ 42, 69).

With respect to Plaintiff's alleged complaint about being instructed to prepare a budget that, in her view, would not comport with law, a question arises as to whether this particular complaint could fall within Section 215, in light of the prospective nature of the Labor Law violation. As noted above, the statutory language governing this case can only support a claim based on a complaint that an employer "has violated" provisions of New York's Labor Law. N.Y. Lab. Law § 215(1) (2008). In this instance, Offensend, the Club's Treasurer, has testified that the preparation of the Club's budget was a "collaborative effort amongst members, the general manager and the comptroller." (Hughes Decl. Ex. F (transcript of Janet Offensend's deposition, conducted May 18, 2011 ("Offensend Dep.")), at 50:25–51:2.) Offensend further testified that a proposed budget would not become an operative document until it was approved by the Club's Board of Governors and ratified by the Club's members. (*See id.* at 43:13–23.) To the extent that Dewailly's requested budget would have violated state law, that violation would not have occurred until the budget was formally adopted. Under the circumstances, this Court finds that Plaintiff cannot show that, at the time Dewailly allegedly instructed her to prepare a budget, the Club "ha[d] violated" the Labor Law. For this reason, Plaintiff cannot maintain a retaliation claim under Section 215 based on her objection to such an instruction, and Defendant is entitled to summary judgment on this claim. *Cf. Vosatka v. Columbia Univ.*, No. 04 Civ. 2936(LAP), 2005 WL 2044857, at *12 (S.D.N.Y. Aug. 24, 2005) (holding that plaintiff could not maintain a claim, under N.Y. Lab. Law § 740(2)(c), that he had been retaliated against for refusing to work on a grant proposal that he believed would violate a New York Health Law, as he could not show proof of "an actual violation").

■■■ Plaintiff, however, also claims that she complained, in general, that the Club's existing policies and practices regarding the collection and distribution of mandatory service charges via the Pegasus Fund violated Section 196–d of New York Labor Law (*see* Am. Compl. ¶¶ 1, 79–82; Pl. Aff. ¶ 42), which provides:

> No employer … shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any

9. While *Weiss* construed Section 215 as amended in 2009, the 2009 amendments would not compel a different interpretation in this regard. *See* 2009 N.Y. Laws ch. 372, § 4 (McKinney).

charge purported to be a gratuity for an employee. . . . Nothing in this subdivision shall be construed as affecting . . . practices in connection with banquets and other special functions where a fixed percentage of the patron's bill is added for gratuities which are distributed to employees. : . . .

N.Y. Lab. Law § 196-d (McKinney 2013). In *Samiento v. World Yacht Inc.*, the New York Court of Appeals held that a mandatory service charge falls within the ambit of Section 196-d if the "service charge has been represented to the consumer as compensation to defendants' waitstaff in lieu of the gratuity." 10 N.Y.3d 70, 79, 854 N.Y.S.2d 83, 883 N.E.2d 990 (2008). "[T]he standard under which a mandatory charge or fee is purported to be a gratuity should be weighed against the expectation of the reasonable customer." *Id.* As the Court noted, "the reasonable patron standard should govern when determining whether a banquet patron would understand a service charge was being collected in lieu of a gratuity." *Id.*

The Court cannot determine on the record submitted whether a reasonable patron would have understood that the Club's mandatory service charge was imposed in lieu of a gratuity. *Cf. Reilly v. Richmond Cnty. Country Club*, 77 A.D.3d 718, 909 N.Y.S.2d 732, 733 (2d Dep't 2010) (itemized mandatory 18%–20% gratuity represented as a gratuity entitled banquet employees to judgment as a matter of law).

Defendant, for its part, asserts that it is "evident by the policies governing the Pe-

gasus Fund" that the mandatory charges "were never held out as being in lieu of gratuities." (Def. Mem., at 8.) The record, however, contains several iterations of policies and procedures governing the Club's use of the Pegasus Fund, and these documents do not even fully answer the question of what the Club *itself intended*, much less what patrons would have understood. Indeed, early policy iterations, relating to a fund that was then called the "Employees' Fund," stated explicitly that this fund did "consist[ ] of contributions in lieu of prohibited gratuities from members and service charges from non-members who use the Club's facilities." (Pl. Aff. Ex. 3 (Policies And Procedures Of The Employees' Fund, dated May 24, 1988 ("May 1988 Employees' Fund Policies"); Sept. 20, 1988 ("Sept. 1988 Employees' Fund Policies"), Nov. 1990 ("1990 Employees' Fund Policies"); Oct. 2004 ("2004 Pegasus Policies"); and Jan. 2007 ("2007 Pegasus Policies")).[10]

Based on the record before the Court, it appears that the "Pegasus Fund," by that name, was not mentioned in the Club's written policies until October 2004. (*See* 2004 Pegasus Policies.) Although no Club representative states that the Employees' Fund was the precursor of the Pegasus Fund, the two appear sufficiently similar to support that conclusion. (*Compare* May 1988 Employees' Fund Policies, Sept. 1988 Employees' Fund Policies, *and* 1990 Employees' Fund Policies, *with* 2004 Pegasus Policies and 2007 Pegasus Policies; *see also* Hughes Decl. Ex. I (transcript of deposition of Rita Chu ("Chu"), conducted

---

**10.** As for the use of this fund, the earliest of the written policies states that the Employees' Fund was meant: "1) to reward both union and non-union employees and banquet staff annually for their efforts; and 2) to supplement the employees' retirement benefits." (May 1988 Employees' Fund Policies.) The policies governing the Employees' Fund were then amended in 1990 to include *per die m*

workers, independent contractors, and "leased employees," as beneficiaries of the Fund. (*See* 1990 Employees' Fund Policies, at 1–2.) In addition to funding year-end gifts and retirement gifts, the Fund purposes were also expanded to pay for Thanksgiving turkeys and to fund "incentive bonuses." (*See* 1990 Employees' Fund Policies, at 1–3.)

June 13, 2011 ("Chu Dep.")), at 13:4–9 (explaining that Chu, a member of the Pegasus Fund Committee, "might have seen" the 1990 Employees' Fund policies in 2004 while revising the Pegasus Fund Policies).) In the earliest written policies regarding the "Pegasus Fund," though, the fund was described as a "revolving fund consisting of (1) contributions from members and (2) charges added to function bills." (*See* 2004 Pegasus Policies, at 1.) [11] Thus, by at least October 2004, the language that expressly showed that amounts included in the "Employees' Fund" had been paid "in lieu of prohibited gratuities" had been eliminated from the written policies covering the Pegasus Fund. What is not clear is whether this was merely a wording change, as opposed to a substantive one. Certainly, the Club's use of the unadorned phrases "contributions from members" and "charges added to function bills" does not make it clear that such contributions and charges were no longer to be viewed as having been made "in lieu of prohibited gratuities." In any event, Defendant has made no showing that Club patrons, including both members *and non-members*, would have had occasion to review the written policies regarding the Pegasus Fund, much less understood from the language cited above that the extra charges that they were being assessed, for use of the facilities, were *not* being assessed in lieu of prohibited gratuities.

In testifying in his deposition about the Pegasus Fund, Dewailly acknowledged that a 15 percent "service charge" had been imposed on banquets for both the Club's members and non-members, as well as for non-members who utilized the Club's overnight facilities. (Dewailly Dep., 18:3–9; 19:9–14.) Dewailly also testified that, as of September 2008, the service charge had been increased to 20 percent and had been renamed an "administrative fee." (*Id.* 14:24–16:18, 17:3–8.) This name change is also not dispositive on the question of whether the fees involved were, at any time, understood by patrons to be paid in lieu of gratuities. *See Copantitla,* 788 F.Supp.2d at 285–86 (citing Opinion Letter from the New York Department of Labor, dated Mar. 11, 2010, which stated that "a number of factors that would bear on the sufficiency of a notice" that a mandatory charge was not meant as a gratuity, including "the label used (*e.g.*, 'administrative fee' is clearer than 'service charge') for the mandatory charge"); *Spicer v. Pier Sixty LLC,* 269 F.R.D. 321, 331–32 (S.D.N.Y.2010) (relying on the same opinion letter as *Copantitla* "because [the letter was] both reasonable and derived from an understanding of the underlying operational practices of the New York banquet industry" (citation and internal quotation marks omitted)).

Further, under regulations effective January 1, 2011, there is now " 'a rebuttable presumption that any charge in addition to charges for food, beverage, lodging,

11. The Pegasus Fund covered the same beneficiaries as the Employees' Fund and, in addition to the benefits provided by the Employees' Fund, provided for training of Club's employees designed to enhance their skills and performance at the Club, and for "other such purposes" that would benefit covered beneficiaries. (*See* 2004 Pegasus Policies, at 1–2.); *see also* Dewailly Dep., at 20:22–24 (testifying that teachers and "probably maybe the mailman" were also beneficiaries of the Pegasus Fund). The 2004 policies further noted that the "Pegasus Committee" could, "in its sole discretion, determine the amount of monies, if any, that shall be reserved and not disbursed from receipts in any fiscal year." (*Id.* at 2.) In January 2007, the policies governing the Pegasus Fund were amended to allow the Fund to pay for payroll taxes on the benefits provided. (*See* 2007 Pegasus Policies, at 2.)

and other specified materials or services, including but not limited to any charge for 'service' or 'food service,' is a charge purported to be a gratuity.'" *Copantitla,* 788 F.Supp.2d at 286 (quoting N.Y. Comp. Codes R. Regs. tit. 12, § 146–2.18(b)). These regulations now require that administrative fees "'shall be clearly identified as such and customers shall be notified that the charge is not a gratuity or tip.'" *Id.* (quoting N.Y. Comp.Codes R. Regs. tit. 12, § 146–2.19(a)). Under the regulations, and despite the language used to describe a particular charge, "'[t]he employer has the burden of demonstrating, by clear and convincing evidence, that the notification [to customers] was sufficient to ensure that a reasonable customer would understand that such charge was not purported to be a gratuity.'" *Id.* (quoting § 146–2.19(b)). Defendant, in this case, has not come forward with evidence sufficient to meet such a burden.

In her own affidavit, Plaintiff states that "Club members and Club guests … understood these service charges to be additional compensation for service employees inasmuch as the Club prohibited direct tipping to employees." (Pl. Aff., ¶ 36). In her deposition, Plaintiff also testified that "the members know that they are putting that money of service, the gratuities towards the employees whenever they pay. And the guests, the guests sometimes would come to me and say these are for the employees." (5/13/11 Pl. Dep., at 27:7–11.) This evidence of the intent of at least some customers of the Club—together with the lack of clarity of fund documents and a seemingly clear history that, at least at some point in time, service charges were intended (even by the Club) to substitute for gratuities—raises an issue of fact as to whether the Pegasus Fund included monies that were understood by patrons to have been paid in lieu of direct tipping. Given the evidence in the record

that the monies in the Pegasus Fund were not distributed to Club employees as gratuities, but were rather used for purposes such as retirement gifts (*see* Discussion *supra* at Section (II)(A)(1)(b) n. 9, n. 10), Plaintiff has demonstrated that triable issues remain as to whether, in her purported complaints to Dewailly, she had identified a colorable violation of Section 196–d, *see Shahriar v. Smith & Wollensky Rest. Group, Inc.,* 659 F.3d 234, 240 (2d Cir. 2011) (noting that, "[b]y its plain terms, § 196–d bars employers from requiring tipped employees to share tips with employees who do not perform direct customer service" (citations omitted)).

### c. Evidence of a Causal Nexus

 Finally, as to Plaintiff's *prima facie* case, the Club argues that Plaintiff cannot demonstrate the existence of a causal connection between any complaint she made about any labor law violation and her termination. First, the Club reiterates its position that it was unaware of any complaint by Plaintiff, and then expands this point to argue that a complaint of which it was unaware could not have been the cause of Plaintiff's termination. (*See* Def. Mem., at 6.) As discussed above, however, Plaintiff's testimony that she voiced informal complaints to Dewailly is sufficient, at this stage, to support her assertion that she placed Defendant on notice of the claimed violations of law. Second, the Club argues that the record shows that it terminated Plaintiff not because of any complaints she may have made, but rather for harassing her subordinates. (*See* Def. Mem., at 7.) This argument, though, is not best framed as a challenge to Plaintiff's ability to establish a *prima facie* case of retaliation, but rather as an articulation of a legitimate, nonretaliatory reason for the Club's action. *See Higueros v. New York State Catholic*

*Health Plan, Inc.,* 630 F.Supp.2d 265, 271 (E.D.N.Y.2009).

▮▮▮▮▮ "In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.' " *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001) (quoting *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996)). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (quoting *Gorman–Bakos,* 252 F.3d at 554). Rather, the Court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* (comparing cases).

Plaintiff states, by affidavit, that she made her complaints to Dewailly on several occasions, including in December 2007 (Pl. Aff. ¶ 42), early January 2008 (*id.* ¶ 46), and again on February 5, 2008 (*id.* ¶ 60). Plaintiff was terminated shortly thereafter, on February 14, 2008. (*See* Termination Letter; Am. Compl. ¶ 10.) At least at this stage, this is sufficient evidence of "temporal proximity" to defeat Defendant's challenge to Plaintiff's ability to make out a *prima facie* case of retaliation. *See Jacques v. DiMarzio, Inc.,* 200 F.Supp.2d 151, 162 (E.D.N.Y.2002) (stating that, "[b]ecause [plaintiff] was terminated soon after her complaints ..., the Court concludes that there exists an issue of material fact as to whether her labor law complaints were a motivating factor in her discharge" (citing *Parker v. Sony Pictures*

*Entm't, Inc.,* 260 F.3d 100, 109 (2d Cir. 2001), *aff'd,* 386 F.3d 192 (2d Cir.2004))).

### 2. *The Club's Proffered Legitimate Reason for Terminating Plaintiff*

▮▮▮ For the above reasons, summary judgment in Defendant's favor is not warranted with respect to Plaintiff's ability to make out a *prima facie* case of retaliation under Section 215. Yet Defendant also argues that the record shows that it had a legitimate, non-retaliatory reason for terminating Plaintiff's employment, *see Lin v. Great Rose Fashion, Inc.,* No. 08–cv–4778 (NGG)(RLM), 2009 WL 1544749, at *17 (E.D.N.Y. June 3, 2009), and that Plaintiff cannot demonstrate that its explanation for her termination was pretextual. Specifically, Defendant asserts that it fired Plaintiff only after "an extensive and thorough investigation by the human resource director, which detailed numerous complaints and concerns about the plaintiff to the Board of [Governors]." (Def. Mem., at 7.) As noted above, Defendant has come forward with documentary evidence, largely in the form of emails, to support its position that Plaintiff's termination was warranted, and it also proffers deposition testimony of its Human Resources Manager, Maas, to explain the termination decision. As described more fully below, this evidence, if credited, would be sufficient to demonstrate a legitimate reason for Defendant's action.

The Club does not identify with any specificity when it purportedly began noticing problems with Plaintiff's managerial style. The record suggests, though, that Plaintiff began experiencing difficulties with one of her subordinates, Patricia Auad ("Auad"), starting in September 2007.[12] In an email dated September 21,

---

12. As the Club's Comptroller, Plaintiff was responsible for training, supervising, and evaluating the other members of the Club's

accounting department. (*See* Pl. Aff. Ex. 12.) This department included two staff members, Auad and Giana Febus ("Febus"), and an

2007, Dewailly explained to Plaintiff that the Club had a progressive disciplinary policy—by which a verbal warning should be given first, followed by three written warnings—and encouraged Plaintiff to begin the progressive disciplinary process with Auad. (*See* Pl. Aff. Ex. 7 (Email from Dewailly to Plaintiff, dated Sept. 21,2007, at 9:56 a.m.).)

Three months later, by email dated December 26, 2007, Dewailly informed Parkinson (the Club's President) and Offensend that Auad had come to his office 'in tears" and told him that Plaintiff had been shouting at her and "banging on her desk." (Pl. Aff. Ex. 7 (Email from Dewailly to Parkinson *et al.*, dated Dec. 26, 2007, at 10:53 a.m.).) In her affidavit, Plaintiff does not deny this, but now explains that Auad had committed a "grievous error" and that Plaintiff "could not help but raise [her] voice against [Auad]." (Pl. Aff. ¶ 73.) In any event, Dewailly also sent Plaintiff an email, warning that she was "exposing the Club to a harassment lawsuit." (Pl. Aff. Ex. 7 (Email from Dewailly to Plaintiff, dated Dec. 21, 2007, at 4:51 p.m.).) That email admonished Plaintiff to "[p]lease behave like a manager" and noted that Plaintiff could not raise her voice, "especially in front of other employees." (*Id.*) Dewailly warned that, if such behavior continued, he would "have to take drastic actions." (*Id.*) In a reply email, Plaintiff explained that she "could hardly cope with [the] mistakes that [Auad] continues to make." (*Id.* (Email from Plaintiff to Dewailly, dated Dec. 21, 2007, at 11:35 p.m.).) Plaintiff also invited Dewailly to "talk to [Febus] and [Maguina] just to have an idea what is going on in our department." (*Id.*)

The next week, Dewailly expressed surprise that Plaintiff had not complained about Auad's performance sooner, noting

that he, himself, had caught one of Auad's mistakes and had given her "another warning." (*Id.*) (Email from Dewailly to Plaintiff, dated Dec. 26, 2007, at 10:08 a.m.). Dewailly asked Plaintiff to document her issues with Auad, stating that, if she did not, the Club would not "have any strength in fighting [Auad's] poor performance." (*Id.*) Dewailly informed Parkinson and Offensend of his exchange with Plaintiff, and noted that he was "not criticizing [Plaintiff's] accounting performance but her management," which, he wrote, "is jeopardizing our ability to take action on [Auad]." (*See id.* (Email from Dewailly to Parkinson et al., dated Dec. 26, 2007, at 10:53 a.m.).)

Maas testified at her deposition that she received a call at home from Auad sometime in January 2008, complaining about Plaintiff's managerial style. (Maas Dep., at 19:14–20:9; *see also id.* at 24:14–19.) Maas further testified that, after receiving what she described as "that troubling phone call," she met with Auad, Febus, and Maguina. (Maas Dep., at 19:25–20:9.) Maas later wrote, in an email to Parkinson, that Auad had reported being "reduced to tears on a regular basis." (Hughes Decl. Ex. K (Email from Maas to Parkinson, dated Jan. 21, 2008, at 1:04 p.m.).) Maas testified that Auad's complaints about Plaintiff were "all substantiated" by Febus (*see* Maas Dep., at 22:15–19), who, upon meeting with Maas, purportedly described the atmosphere in the accounting department as "poison" (*see id.* at 30:25–31:3). According to Maas, Febus complained that Plaintiff would "publicly humiliat[e] people" (*see id.* at 31:6–9) and that Febus "couldn't work there anymore because ... if [Plaintiff] didn't like somebody, she would yell at them" (*id.* at 31:6–9). Maas also testified that Febus had complained

intern, Zelly Maguina ("Maguina"). (*See* Def. 56.1 Stmt. ¶ 9; Pl. 56.1 Stmt. ¶ 9.)

that Plaintiff refused to train her and Auad, preferring to instead train the department's intern, Maguina. (*Id.* at 31:25–32:19.) Maas testified that she had also spoken to Maguina, who had purportedly said that she felt uncomfortable in the department because Plaintiff "favored her" and "kept saying it out loud to the other employees." (*Id.* at 33:14–21.)

It appears that, after meeting with Plaintiff's subordinates, Maas sent an email to Parkinson on January 21, 2008, recommending that Plaintiff "be terminated as soon as possible for 'harassment.'" (Hughes Decl. Ex. K (Email from Maas to Parkinson, dated Jan. 21, 2008, at 1:04 p.m.).) Maas noted that, as a woman's club, the Club was "very familiar with what 'less than equal treatment' looks like and as such it is shameful that we have permitted [Plaintiff] to do treat anyone badly MORE THAN ONCE." (*Id.*) Maas concluded that failure to act would "give[ ] the impression [the Club] condone[d] the behavior," and that consequently, "[a] decisive strike is in order." (*Id.*) Maas later claimed to have reached this conclusion after consulting with a labor attorney. (*See* Maas Dep., at 45:12–15.) Maas also noted in her email that, while the Club could employ its "progressive discipline approach," doing so "would take too long." (Hughes Decl. Ex. K (Email from Maas to Parkinson, dated Jan. 21, 2008, at 1:04 p.m.).)

That afternoon, Parkinson apparently forwarded Maas's email to the other members of the Club's Board of Governors, noting that she (Parkinson) "want[ed] to act" and that, if the Board concurred, she would "make an appointment with [Dewailly] to deliver the message." (Hughes Decl. Ex. K (Email from Parkinson to the Club Board of Governors, dated Jan. 21, 2008, 1:28 p.m.).)

Eight days later, on January 29, 2008, Parkinson emailed Offensend and asked her and Maas to convey to Dewailly that the Board wanted "the dismissal of [Plaintiff] to be his first priority," as the Board did not want Plaintiff "as our employee acting as she has been." (Hughes Decl. Ex. K (Email from Parkinson to Offensend, dated Jan. 29, 2008, at 3:41 p.m.).) Parkinson added, "I am extremely frustrated at the lack of action and his timidness to do this hard thing," and referenced a conversation she had with Dewailly the week before and the need to provide Dewailly with the "support to do this hard thing." (*Id.*) In a reply email of the same date, Offensend stated that she would "do [her] best "to move this along," but noted that both she and Dewailly were not eager to leave the accounting department without someone in charge. (Hughes Decl. Ex. K (Email from Offensend to Parkinson and Maas, dated Jan. 29, 2008).) Offensend suggested that they "move at a steady and planful pace" as they were "not in a situation involving malfeasance." (*Id.*)

Later that evening, Parkinson emailed Offensend and Maas and stated that Dewailly was "resisting what he perceives as making hasty decisions" and did not "want to be rushed." (Hughes Decl. Ex. K (Email from Parkinson to Offensend and Maas, dated Jan. 29, 2008, at 9:06 p.m.).) Parkinson added that Dewailly "knows that [the Board] want[s] him to move" and that she was "inclined to let him do it at his pace." (*Id.*) In a reply email, also sent that evening, Offensend stated that it was her impression that Dewailly's actions were "deliberate and judicious." (Hughes Decl. Ex. K (Email from Offensend to Parkinson and Maas, dated Jan. 29, 2008).)

On the morning of January 30, 2008, Maas replied to Offensend and Parkinson, noting that, in her view, Dewailly was concerned with managing the timing of firing

a senior employee and then finding a replacement. (Hughes Decl. Ex. K (Email from Maas to Parkinson and Offensend, dated ·Jan. 30, 2008, at 5:46 a.m.).) In reply, Parkinson noted that Dewailly was already planning to interview a potential replacement Comptroller that evening and stated that her "frustration might have put in place a bit of a hurry and perhaps a false sense of urgency." (Hughes Decl. Ex. K (Email from Parkinson to Mass and Offensend, dated Jan. 30, 2008, at 8:32 a.m.).) Offensend then responded with another email, in which she stated that she was "vastly relieved" that "([the group] ALL already MADE the decision) effectively." (Hughes Decl. Ex. K (Email from Offensend to Mass and Parkinson, dated Jan. 30, 2008.).)

As noted above, Defendant has also submitted a January 29, 2008 memorandum, apparently authored by Maas (*see* Hughes Decl. Ex. N), identifying a number of issues related to Plaintiff's interactions with her subordinates. Among other things this memorandum concludes that Plaintiff was a "poor communicator," who was "not able to lead," "exhibit[ed] poor judgment," and was "divisive and unprofessional as a manager of a department." (*Id.*)

Maas testified that, on February 14, 2008, Plaintiff was called to a meeting with Dewailly, Offensend, and Maas. (Maas Dep., at 48:16–49:12.) According to Maas, Dewailly explained, at that meeting, that the Club was terminating Plaintiff's employment because of Plaintiff's "inability to be an effective manager" and her "inability to work with her employees." (*See id.* at 50:11–18.) Dewailly apparently presented Plaintiff with a letter of termination, which he, Plaintiff, Offensend, and Maas all signed. (*See* Termination Letter.)

Taken as a whole, Defendant's proffered evidence is sufficient to set forth a legitimate and non-retaliatory reason for the termination of Plaintiff's employment. Plaintiff does not contest that difficulties existed within her department, nor that she and Dewailly had spoken about those difficulties over several months. (*See* Pl. Aff., ¶ 74.) Even apart from the lengthy email chain, if a jury were simply to credit Maas's testimony regarding his conversations with Plaintiff's subordinates, then it would be entitled to find that Maas's report to the Club's governors, recommending Plaintiff's termination, was based on serious complaints regarding Plaintiff's purported inability to act as an effective supervisor of her department. *See Middleton v. Metro. Coll. of New York,* 545 F.Supp.2d 369, 376 (S.D.N.Y.2008) (noting that "it is not the province of the courts to function as a super-personnel department and second-guess an employer's business judgment" (citations omitted)).

### 3. *Evidence of Pretext*

As the Club has proffered a legitimate and non-retaliatory explanation for terminating Plaintiff, and has supported this explanation with evidence in admissible form, this case should only proceed to trial if Plaintiff has come forward with evidence capable of showing "that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate." *El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010) (citing *Stratton v. Dep't for the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997)). In this context, it is not enough for Plaintiff merely to point to the temporal proximity of her complaints and her termination; instead, she must present "some evidence of pretext in order to raise a triable issue of fact." *See id.*

On the issue of pretext, Plaintiff argues that the Club's failure to follow its own progressive disciplinary policy is evidence that the Club's proffered reason for terminating Plaintiff was pretextual. (Pl. Mem.,

at 6–11.) For support, Plaintiff cites the Club's Handbook (Pl. Aff. Exs. 10–11 ("Club Handbook") [13]), which states that the Club "employs progressive disciplinary actions" (*id.* at 31). Under the policy, as set forth in the Handbook, an employee's first infraction leads to a verbal warning. (*Id.*) The second leads to a written warning and, depending on the severity of the infraction, suspension, if not outright dismissal. (*Id.*) The third leads to termination. (*Id.*) The Handbook also enumerates several types of violations of company policy that can lead to immediate dismissal, including: "theft, aggravated assault or rape committed on the Club's premises, guilty conviction for criminal offenses in general, weapons' possession, drugs, narcotics and alcohol possession" (*id.*)—none of which were at issue in Plaintiff's case.

In his deposition, Dewailly's explanation of the Club's progressive disciplinary policy differed from the policy as presented in the Handbook. First, Dewailly testified that the policy provided for one verbal warning, followed by a second written warning, and then a final written warning. (Dewailly Dep., at 22:8–9, 28:18–19.) Second, Dewailly identified several violations that, he stated, would be grounds for immediate dismissal, including "failure to perform your job correctly ..., [s]tealing, hitting or fighting with an employee," and also "formal harassment." (*Id.* at 22:13–25.) The Handbook itself identifies neither poor job performance nor "harassment" as grounds for immediate termination (*see* Club Handbook), a fact of which Dewailly was seemingly aware, as he himself had told Plaintiff to use progressive discipline with Auad, for performance issues (*see* Pl. Aff. Ex. 7 (Email from

Dewailly to Plaintiff, dated Sept. 21, 2007, at 9:56 a.m.)).

In addition, although the Handbook does state that the Club "does not and will not tolerate any type of harassment of our employees" (Club Handbook, at 9), the Handbook principally defines "harassment" in terms of conduct relating to the harassed person's "gender, ethnicity, race, color, creed, religion, sexual orientation, marital status, military service status or any other protected classification" (*id.*), which does not appear to be the type of "harassment" of which Plaintiff was accused.

The apparent inconsistencies between Defendant's formal disciplinary policies and how Plaintiff was treated, together with the temporal proximity of Plaintiff's purported complaints and her termination, are enough to create a triable issue of fact as to whether Defendant's stated reason for terminating Plaintiff's employment was pretextual. *See Casalino v. New York State Catholic Health Plan, Inc.,* No. 9 Civ. 2583(LAP), 2012 WL 1079943, at *17, 2012 U.S. Dist. LEXIS 46233, at *50–51 (S.D.N.Y. Mar. 30, 2012); (finding that "true questions of fact exist[ed] as to whether ... [defendant's] stated legitimate nondiscriminatory reasons [were] merely pretextual," where defendant had, *inter alia,* "ignored its own 'corrective action' policy set forth in detail in its Employee Handbook [and] [p]laintiff was terminated without any written warnings issued under the policy" (following *Hubbard v. Total Commc'ns, Inc.,* 347 Fed.Appx. 679, 680–81 (2d Cir. 2009))); *Givens v. AMF Terrace Garden Lanes,* No. 04–CV–6586 CJS, 2006 WL

---

**13.** This version of the Handbook appears to have been created or modified after Plaintiff's termination, as it is dated 2009. (*See* Handbook, at 1; *see also* Dewailly Dep., at 26:19–20 (stating that the Handbook became effective in 2009).) Nonetheless, a jury could reasonably find that the Handbook at least memorialized the policies that Defendant had in place at the time of Plaintiff's termination, in 2008.

1520208, at *4, 2006 U.S. Dist. LEXIS 35633, at *14–16 (W.D.N.Y. May 30, 2006) (finding sufficient evidence to create a triable issue of fact as to whether defendant's proffered reason for its actions was false, and whether the real reason for its actions was discrimination, where the evidence showed that "defendant [had] failed to follow its Progressive Discipline Policy set forth in [its] Employee Handbook").

Moreover, Plaintiff has put forth evidence suggesting that, shortly after she was fired, Defendant's management prepared and adopted a budget that did exactly what Plaintiff had allegedly protested— *i.e.*, it diverted proceeds from the Pegasus Fund to the Club's Food and Beverage account. (*See* Pl. Mem., at 1; Pl. Aff. Ex. 14 (Financial Spreadsheet, dated May 28, 2011); Pl. Aff. Ex. 5 (Proposed Budget).) This may be viewed as additional circumstantial evidence that Defendant's proffered reason for Plaintiff's termination was pretextual. *See Hubbard,* 347 Fed.Appx. at 680–81 (2d Cir.2009) (holding that the jury was entitled to find defendant's explanation pretextual where plaintiff had introduced evidence that called into question defendant's explanation for her termination); *Casalino,* 2012 WL 1079943, at *15, 2012 U.S. Dist. LEXIS 46233, at *43 ("There is no doubt that certain of [p]laintiff's proffered evidence is circumstantial, but circumstantial evidence on the issue of causation and in rebutting [defendant's] non-discriminatory motive for Plaintiff's termination is permissible." (citing *Henry v. Wyeth Pharmaceuticals, Inc.,* 616 F.3d 134, 148 (2d Cir.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 1602, 179 L.Ed.2d 516 (2011); *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000))).

■ On a motion for summary judgment on a retaliation claim, the question before the Court is not whether Plaintiff has actually demonstrated that Defendant's proffered reason for her termination was entirely false, but rather, "whether, based on the evidentiary showing to date, Plaintiff may 'invite the jury to ignore the [D]efendant's proffered legitimate explanation and conclude that [retaliation] was a motivating factor, whether or not the employer's proffered explanation was also in the employer's mind." *Casalino,* 2012 WL 1079943, at *18, 2012 U.S. Dist. LEXIS 46233, at *51–52 (citing *Fields v. N.Y.S. Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 121 (2d Cir.1997)). Resolving all ambiguities and drawing all reasonable inferences against Defendant, as this Court must, the Court cannot conclude "that there is no genuine dispute as to any material fact" regarding the issue of pretext and that Defendant "is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(a).

**B. Plaintiff's Breach of Contract Claim**

■ Plaintiff claims that the Club breached its contract to pay her a guaranteed annual bonus of at least $10,000. Under New York law, the elements of a breach of contract claim are "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Swan Media Group, Inc. v. Staub,* 841 F.Supp.2d 804, 807 (S.D.N.Y.2012) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2d Cir. 2004); *Johnson v. Nextel Comm's, Inc.,* 660 F.3d 131, 142 (2d Cir.2011)).

Plaintiff states in her affidavit that Evans, the former Club Manager, offered her a position as the Club's Comptroller with "annual compensation of at least $100,000 and a guaranteed annual bonus of at least $10,000." (Pl. Aff. ¶ 4.) Further, in her

deposition, Plaintiff testified that, while reviewing the terms of the Club's offer, Evans expressly stated that the Club would pay Plaintiff "$10,000 at the end of the year." (Hughes Decl. Ex. D (transcript of Plaintiff's deposition, conducted Jan. 25, 2011), at 36:20–23.) Plaintiff also testified that she understood Evans' offer to be a "starting base" that "could get higher because it changes every year." (*Id.* at 38:10–13.) According to Plaintiff, the bonus was meant to entice her to leave her position at a different club, as, in leaving that position, she would have to forfeit her pension before it had fully vested. (*Id.* at 35:6–17.)

Plaintiff claims that, after accepting Evans' offer, the Club failed to pay her the full bonus of $10,000. She states in her affidavit that, in 2005, the Club paid her a pro-rated bonus of $5,000, and in 2006, the Club paid her a bonus of $6,000. (*See* Pl. Aff. ¶¶ 8, 19; Pl. Aff. Ex. 2.) Plaintiff also presents a letter dated January 11, 200[7],[14] to Evans and several members of the Board, in which Plaintiff complained that the Club had failed to pay her a "[m]inimum annual bonus of $10,000." (Pl. Aff. Ex. 2.) In her deposition, Chu, chair of the Defendant's house committee from 2004 through 2007 (Chu Dep., at 6:16–23), stated that she recalled "this incident," although she could not remember if the matter was resolved. (Chu Dep., at 43:7–15.)

Defendant, however, argues that Plaintiff's purported oral contract cannot be enforced under the New York Statute of Frauds. (Def. Mem., at 8–10) In this regard, Defendant characterizes Plaintiff's alleged contract as, at most, an agreement by Defendant to pay her a bonus in connection with the work she performed each year, once that year had passed. (*See id.*, at 9.) Defendant then relies on Section 5–1105 of the New York General Obligations Law, which provides that

[a] promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y. Gen. Oblig. Law § 5–1105 (McKinney 2013). According to Defendant, as Plaintiff's purported contract was supported only by "past consideration," it would have had to have been in writing to be enforceable. (Def. Mem., at 9 (citing General Obligations Law § 5–1105 and *Clark v. Bank of New York*, 185 A.D.2d 138, 585 N.Y.S.2d 749 (1st Dept.1992) (defining consideration for allegedly promised bonus as "work that [plaintiff] had already performed")).).

This argument is not persuasive, as Plaintiff's claimed agreement, by which she was allegedly promised a certain bonus, was "not based solely on past consideration, but on present and future consideration, respectively, [P]laintiff's promises to leave [her] current employer to join [D]efendant and to work for [D]efendant." *Ryan v. Kellogg Partners Institutional Services*, 79 A.D.3d 447, 914 N.Y.S.2d 81, 83 (1st Dep't 2010) *aff'd*, 19 N.Y.3d 1, 14–15, 945 N.Y.S.2d 593, 968 N.E.2d 947 (2012); *see also Matter of Ball* (*SFX*

---

14. While this letter bears the date of "January 11, 2006," the year appears to be a typographical error, as any letter written by Plaintiff regarding Defendants alleged failure to pay her full bonus for 2006 could not have been written at the beginning of that year. Further, in her affidavit, Plaintiff states that the date of this letter was January 27, 2007. (*See* Pl. Aff., ¶ 21.)

*Broad. Inc.*), 236 A.D.2d 158, 665 N.Y.S.2d 444, 446 (3d Dep't 1997). As the Club's Statute-of-Frauds argument fails, its motion for summary judgment dismissing Plaintiff's breach-of-contract claim must be denied.

### C. *Plaintiff's Claim for Earned Wages*

██ Finally, Defendant contends that "bonuses" are not "wages," and thus Plaintiff's claim for its alleged failure to pay wages under Article 6 of New York Labor must be dismissed. Under Section 193 of New York Labor, "[n]o employer shall make any deduction from the wages of an employee," except under certain conditions not relevant here. N.Y. Lab. Law § 193 (McKinney 2013). Section 190 of New York Labor Law defines wages as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." *Id.* § 190(1).

██ New York has a "long standing policy against the forfeiture of earned wages." *Weiner v. Diebold Group, Inc.*, 173 A.D.2d 166, 568 N.Y.S.2d 959, 961 (1st Dep't 1991). While Section 193 does not protect bonuses that are "payable at the discretion of the employer," *see e.g., id.* at 960, the New York Court of Appeals has clarified that bonuses may be considered "wages" for the purposes of Section 193 when their payment is "guaranteed and non-discretionary as a term and condition of [plaintiff's] employment." *Ryan v. Kellogg Partners Institutional Services*, 19 N.Y.3d 1, 16, 945 N.Y.S.2d 593, 968 N.E.2d 947 (2012).

Plaintiff alleges that she assented to an employment contract that included "a guaranteed annual bonus of at least $10,000." (Pl. Aff. ¶ 4.) To the extent the Club argues that its payment of lesser bonuses establishes that Plaintiff's bonuses were discretionary, such contentions do little more than create an issue of triable fact. As the Club has failed to show that it is entitled to judgment as a matter of law as to Plaintiff's claim for failure to pay earned wages, summary judgment as to that claim must also be denied.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 32) is granted as to Plaintiff's claim for retaliation under Section 215 of New York Labor Law, to the extent that claim is based on Defendant's alleged retaliation against Plaintiff for complaining about being instructed to prepare a proposed budget. Defendant's motion is otherwise denied.

SO ORDERED.